A04A2082. PREMIER/GEORGIA MANAGEMENT COMPANY, INC. v. REALTY MANAGEMENT CORPORATION et al.

(613 SE2d 112)

MIKELL, Judge.

In this action for fraud, breach of fiduciary duty and conspiracy to breach a fiduciary duty involving the development of a $40,000,000 apartment complex, Premier/Georgia Management Company ("Premier") appeals the trial court's one-sentence orders granting summary judgment to the defendants, Realty Management Corporation d/b/a Lane Company ("RMC"), Realty Development Corporation ("RDC"), Lane Realty Advisors (collectively, the "Lane Companies"), George H. Lane III, and Columbus Hotel Associates, L.P. ("Columbus"). Premier argues that the trial court erred in: (1) holding that defendants, neither singly nor in conspiracy, defrauded Premier; (2) holding that Lane did not breach a fiduciary duty to Premier; and (3) granting summary judgment to defendants, other than Lane, on Premier's claim for conspiracy to breach a fiduciary duty, because a material issue of fact exists as to whether defendants conspired to aid and abet Lane in his breach of fiduciary duty to Premier. For the reasons which follow, we affirm.

1. Although Court of Appeals Rule 25 (a) (1) and (c) (3) (iii) require that parties cite to the record by specific volume of the record and page number, counsel for defendants have failed to comply with the volume requirement and counsel for Premier has failed to comply with either requirement in his statement of facts.[1] Accordingly, if we have omitted any facts or failed to locate some evidence in the record, the responsibility rests with counsel.[2]

2. Premier argues that the affidavits filed in support of Columbus's motion for summary judgment were untimely and that Premier moved to strike them. Premier further asserts that Columbus never sought or obtained an order extending the time for filing the affidavits and that, therefore, the trial court erred in granting Columbus's motion for summary judgment because "the untimely-filed affidavits were erroneously relied upon by the trial court." We disagree. Because Premier never obtained a ruling on its motions to strike the affidavits, the trial court did not err in relying on the affidavits. "It is the duty of counsel to obtain a ruling on his motion, and the failure to do so will ordinarily result in a waiver."[3] As Premier has waived any

---

[1] Curiously, Premier's counsel cites amply to the record in his "Statement of the Proceedings Below."

[2] See *Waller v. Economic & Community Dev. Dept.*, 269 Ga. App. 129, 132 (2) (603 SE2d 442) (2004) (" '[t]his Court has repeatedly held that it is not the function of this Court to cull the record on behalf of a party' ") (citation and footnote omitted).

[3] (Footnote omitted.) *Williams v. Resurgens and Affiliated Orthopaedists*, 267 Ga. App. 578,

objection to the affidavits, the trial court properly relied on them in ruling on the motion for summary judgment.

3. Premier further contends that the trial court erroneously treated defendants' motions as motions for summary judgment, instead of motions for judgment on the pleadings. Again, we disagree. "If, on a motion for judgment on the pleadings, matters outside of the pleadings are presented to and not excluded by the court, the motion is treated as one for summary judgment."[4] Here the trial court presumably considered matters outside the pleadings, including the affidavits objected to by Premier, thereby treating the motions as ones for summary judgment.

> To obtain summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. On appeal, this Court applies a de novo standard of review and must draw all inferences in favor of the nonmoving party. If, however, there is no evidence sufficient to create a genuine issue as to any essential element of plaintiff's claim, that claim tumbles like a house of cards. All of the other disputes of fact are rendered immaterial.[5]

Viewed in the light most favorable to Premier, the record reflects that from October 1994, through April 1996, Premier and its sole shareholder, David L. Smith, worked to assemble and rezone property on Sidney Marcus Boulevard in Atlanta, to permit the construction of a 420-unit apartment complex, to be called Summer Pines Apartments (the "Project"). According to Smith, from October 1995, through May 1996, the Lane Companies and Columbus, "through its alter ego, Howe Whitman," worked with Premier in perfecting the design, performing value engineering, and obtaining financing for the proposed Project.

Smith's relationship with Whitman, president of Whitman Investment Company, the corporate general partner of Columbus, began in September 1995, when Smith contacted Whitman to discuss funding for the Project. Smith described to Whitman both phases of the Project and advised him that the parcels for both phases were

---

580 (2) (600 SE2d 378) (2004). See also *Clauss v. Plantation Equity Group*, 236 Ga. App. 522, 523 (1) (512 SE2d 10) (1999).

[4] (Footnote omitted.) *Canberg v. City of Toccoa*, 245 Ga. App. 75, 77 (535 SE2d 854) (2000).

[5] (Footnotes omitted.) *Jerry Dickerson Presents v. Concert/Southern Chastain Promotions*, 260 Ga. App. 316, 322 (579 SE2d 761) (2003). See also *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

under contract to be purchased by Daltex Realty, Inc. ("Daltex"), from the resident owners and that Daltex had contracted to sell those parcels to Smith on or about July 17, 1996. Whitman advised Smith that he was not interested in a long-term equity partnership in the Project, but that he would agree to make a short-term loan. Accordingly, Whitman formed Whitman, Whitman & Merkle, LLC ("WWM"), which agreed to loan money to Smith in exchange for Smith's promise to repay the money upon terms agreed to by the parties and equity participation in the Project. On October 27, 1995, WWM loaned to Smith $350,000 and Smith executed a Promissory Note in the principal amount of $350,000, with a maturity date of January 30, 1996. Premier guaranteed Smith's indebtedness under the loan. Shortly thereafter, Smith asked WWM, and WWM agreed, to loan him an additional $500,000.

Premier alleges that in March or April 1996, Whitman approached Lane and Marc Pollack, principals of the Lane Companies, regarding a partnership or joint venture to develop the Project. According to Premier, it was at this time that Whitman and Lane, personally and through their various entities, "entered into [a] conspiracy to defraud [Premier] of its interest in the Project."

According to Whitman, by May 1996, Smith and Premier were in default on their various agreements with WWM. Accordingly, on May 20, 1996, Premier, together with Smith and an affiliate corporation, Glenridge Investment Corporation ("Glenridge"), entered into an agreement (the "May Agreement") with WWM, which provided that "WWM will use its best efforts to negotiate and structure a venture whereby the Lane Companies or some affiliates thereof will contract to purchase all of the First Phase Property and Second Phase Property [of the Project for development]." The May Agreement further provided that WWM would use its best efforts to structure a venture whereby *Smith* would be reimbursed his "out-of-pocket costs . . . relative to the First Phase Property"; that *Smith* would "receive no less than twenty-five percent (25%) of the General Partner's profits in the venture as relates to the Second Phase Property"; and that WWM would receive ten percent of any of the profits paid to Smith. Premier was not entitled to receive any payments or profits from the Project. Finally, the May Agreement provided that,

> [i]f WWM is unsuccessful in negotiating and forming the [v]enture on or before June 15, 1996[,] and if the [v]enture does not close and acquire title to the First Phase Property on or before July 14, 1996, then WWM will assign to Smith the First Phase Contracts upon payment by Smith of $32,500.00

representing the additional Earnest Monies deposited by WWM.

According to Whitman, between May 1996 and July 14, 1996, WWM and Smith negotiated with the Lane Companies regarding a mutually agreeable venture arrangement for the Project. According to Premier, however, on July 9 and 10, 1996, Whitman and Lane "met secretly and drafted a written partnership or venture agreement solely between [Lane and Columbus] which included no interest for [Premier]," while simultaneously representing to Premier that they were partners.[6] The entity originally was called Summer Pines Properties, LLC, but was later changed to Canterbury Square, LLC ("Canterbury"). Canterbury allegedly was organized by defendants for the purpose of purchasing the Project and developing an apartment complex on the property.

On July 11, 1996, Premier told Whitman about Raymond Schoenbaum, a potential financier interested in the Project, and allowed him to listen to a phone conversation between Smith and Schoenbaum's financial advisor. After this conversation, and despite his alleged "secret" agreement with Lane, which excluded Premier, Whitman told Smith that a venture with Lane was a "sure thing" and insisted that "the deal was still good for [Premier]."

On July 15, 1996, Whitman called Smith to advise him that Whitman and Lane wished "to close the property into a partnership that would not include any interest for any [p]laintiff party." Around this same time, Premier alleges that defendants' attorneys "began secretly planning and executing a closing for five properties . . . , known as Phase I . . . , as well as, [preparing to gain] absolute control of the seven, Phase II properties for the sole benefit of defendants." As part of this plan, defendants' attorneys, without advising Premier, sought from Daltex the immediate assignment of the Phase I and Phase II contracts.[7] Defendants' attorneys also advised the real estate broker representing the owners of the Phase I and Phase II properties that a closing had been scheduled for July 17, 1996. When Smith learned about the closing from the broker, he advised the broker that it was a mistake and that Premier planned to close with Schoenbaum. At the exact same time, defendants allegedly advised their attorneys

---

[6] A copy of this alleged agreement is either absent from the record, or Premier has not cited to it.

[7] Though Premier alleges that it had no knowledge of this assignment, copies of the letter from defendants' counsel to Daltex seeking execution of the assignment, dated July 15, 1996, were sent to Whitman, Pollack, and Smith.

to plan for a closing on July 17, 1996, with the owners of the five parcels in Phase I, for a company unknown to [Premier] called [Columbus], who was to be a venture partner owning 60% of the Lane/Whitman "venture," with 10% to be owned by [WWM] and [the remaining] 30% . . . by [Lane] or his affiliates [with no interest for Premier].

Also on this date, an employee of RDC allegedly removed engineering plans for Phase I from the City of Atlanta Building Department. On July 16, 1996, Daltex advised defendants' counsel that it was terminating the assignment between Daltex and Canterbury because "[s]aid [a]ssignment was executed and predicated on an agreement whereby Canterbury . . . would close Phase I property on or before July 14, 1996. [Daltex has] been notified this date by . . . Smith that the closing did not occur as agreed and that said agreement has expired."

On July 17, 1996, Whitman wrote a memo to Smith, Premier, and Glenridge advising them that WWM "has been unsuccessful in negotiating a venture as contemplated by [the May Agreement] nor has WWM been successful in closing the purchase of the First Phase Property. . . . [W]e are [therefore] willing and able to assign to you all contracts as provided in the [May Agreement] upon payment to WWM of $32,500." Also on this date, defendants and their attorneys agreed to cooperate with Smith and Premier in their efforts to form a partnership with Schoenbaum to buy and develop the Project. Despite their promise of cooperation, however, Smith averred that defendants and their "agents tried their best to destroy [Premier's] relationship with Schoenbaum and prevent [Premier] from closing on the Project." On July 19, 1996, Premier "moved forward to form a partnership" with Schoenbaum, which provided that Premier would receive "a 35% equity and property interest, valued at over $9,000,000.00, as well as other reimbursements, fees and mark ups totaling over $2,000,000.00." Premier eventually closed on the property and entered into a contract with Schoenbaum to develop the Project.

In August 1996, WWM filed suit against Smith, Premier and other entities, seeking (1) payment on the loans that WWM had made to Smith and his entities and (2) a declaratory judgment relating to certain plans that had been prepared for the Project. Smith filed counterclaims in both actions and Premier filed a counterclaim in the declaratory judgment action. No claims were asserted against Columbus. On June 3, 1997, Whitman, WWM, Smith, Premier, and Smith's related entities entered into a settlement agreement, in which they released each other and dismissed the pending actions.

Premier filed its verified complaint in this action on September

27, 1999,[8] alleging that defendants conspired to take over the Project to the exclusion of Premier and that Whitman entered the May Agreement with no intention of abiding by its terms. Premier contends that defendants knew that Premier's contractual rights to the Project were about to expire; that defendants conspired to propose partnership agreements with Premier to finance and develop the Project, which agreements defendants had no intention of performing; that defendants intended for Premier to rely on their misrepresentations until it was too late for Premier to obtain other financing, or another partner to close on the Project; and that defendants then planned to offer Premier little or nothing for its interest in the Project and take over the Project for their own benefit. According to Premier, "[a]s a proximate cause of [d]efendants' . . . bad faith conduct in delaying the project, [Premier's] interest in the ongoing project with Shoenbaum [sic] was reduced from 35% to 10%, costing [Premier] over $6,500,000.00 in lost profits and income." Moreover, Premier claims a loss of $1,200,000 in markup profits on the two properties and punitive damages.

On April 16, 2003, the Lane Companies filed their motion for summary judgment. Following a hearing, the trial court, in a one-sentence order, granted the motion. Subsequently, the trial court denied Premier's motion to reconsider. On June 24, 2003, Columbus filed its motion for summary judgment, and on July 17, 2003, Lane filed his motion for summary judgment. On September 22, 2003, the trial court, in one-sentence orders, granted both motions. Premier appeals from these orders.

(a) Premier first contends that the trial court erred in holding that defendants, neither singly nor in conspiracy, defrauded Premier. We disagree.

To survive a motion for summary judgment on its fraud claim, Premier must offer some evidence to support each of the following elements: (1) a false representation; (2) scienter; (3) intention to induce Premier to act or refrain from acting; (4) justifiable reliance by Premier; and (5) damages to Premier.[9] Summary judgment is appropriate if only one essential element of Premier's claim is eliminated.[10] In this case, we need not address each of the elements because the record fails to raise a factual question regarding damages.

As a general rule, "the question of damages cannot be left to speculation, conjecture and guesswork."[11] Further, "loss of expected

---

[8] Subsequently, Premier filed two amendments to its verified complaint.

[9] See *Lanier Home Center v. Underwood*, 252 Ga. App. 745, 748 (5) (557 SE2d 76) (2001).

[10] See *Johnson v. Rodier*, 242 Ga. App. 496, 498 (2) (529 SE2d 442) (2000).

[11] (Punctuation and footnote omitted.) *Pendley Quality Trailer Supply v. B & F Plastics*,

profits are not recoverable as they are too speculative, remote, and uncertain."[12] To recover lost or expected profits, a plaintiff must prove the probable gain with great specificity.[13] Here, Premier has failed to carry its burden. In its verified complaint and brief to this Court, Premier simply alleges, without pointing to any evidence in the record, that it lost profits because its interest in the Project was reduced from thirty-five percent to ten percent.[14] "Allegations, conclusory facts, and conclusions of law cannot be utilized to support or defeat motions for summary judgment."[15]

Premier cites to *Gipson v. Phillips*[16] for the proposition that "mere difficulty in fixing the exact amount of the lost profits when this loss is proximately caused by the alleged injury does not constitute a legal obstacle to their recovery, provided that the amount of the recovery comes within that authorized with reasonable certainty by the legal evidence submitted."[17] Though we find nothing wrong with Premier's reliance on *Gipson*, and recognize that a verified complaint may serve as the functional equivalent of an affidavit,[18] Premier has failed to submit the legal evidence required by *Gipson*. Premier's mere assertion that it lost profits, without more, is insufficient to create an issue of fact on its claim for damages.

Throughout its briefs, Premier repeatedly argues that defendants have tendered nothing to support summary judgment against Premier's fraud claim. In its initial brief to this Court, Premier states that it "adequately pled a claim for damages[; however,] Lane chose not to plumb the nature of those damages through discovery, and may not now substitute a motion for summary judgment as a learning

---

260 Ga. App. 125, 126 (1) (578 SE2d 915) (2003).

[12] (Citation omitted.) *Appling Motors v. Todd*, 143 Ga. App. 644, 645 (2) (b) (239 SE2d 537) (1977). See also *Tri-State Systems v. Village Outlet Stores*, 135 Ga. App. 81, 84 (2) (217 SE2d 399) (1975) ("In general, unless . . . lost profits are capable of definite ascertainment, and are traceable directly to the acts of the other party, they are not recoverable.") (citations and punctuation omitted).

[13] *Authentic Architectural Millworks v. SCM Group USA*, 262 Ga. App. 826, 832 (4) (586 SE2d 726) (2003).

[14] In addition to the lack of data in the record to support Premier's claim for lost profits and damages, we note that the May Agreement between WWM, Glenridge, Smith and Premier did not provide for Premier to receive any payments or any percentage of any profits from the Project. Rather, as noted above, the May Agreement provides that "*Smith* will receive no less than twenty-five (25%) of the General Partner's profits in the Venture as relates to the Second Phase Property."

[15] (Citation and punctuation omitted.) *Johnson v. MARTA*, 230 Ga. App. 105, 107 (1) (495 SE2d 583) (1998).

[16] 232 Ga. App. 235 (501 SE2d 570) (1998).

[17] (Citation and punctuation omitted.) Id. at 236.

[18] See *Weekes v. Nationwide Gen. Ins. Co.*, 232 Ga. App. 144, 149 (3) (b) (500 SE2d 620) (1998).

tool." Premier's argument, however, disregards Georgia's longstanding law on summary judgment:

> A defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case; instead, the burden on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case. *If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue.*[19]

Because Premier's claim for lost profits is unsubstantiated by any precise data or records, defendants are entitled to summary judgment on Premier's claim for fraud.[20]

(b) Premier next contends that the trial court erred in granting summary judgment to Lane on its claim for breach of fiduciary duty. We do not agree.

Premier alleges that Lane owed it a fiduciary duty because the parties had built and operated projects as partners in the past and were forming another partnership to jointly build the Project in question.[21] A confidential relationship arises where "one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc."[22] The party alleging the existence of a confidential relationship bears the burden of establishing its existence.[23] Assuming that a confidential relationship is proved, the plaintiff, in order to recover for breach of fiduciary duty, must show proof of three elements: (1) a duty between the parties; (2) breach of that duty; and (3) damage proximately caused by the breach.[24]

---

[19] (Citation omitted; emphasis supplied.) *Lau's Corp.*, supra.

[20] See, e.g., *Tri-State Systems*, supra (assertion by company's president that his business was damaged in the amount of $40,000 was "without value in the absence of any records or statements reflecting the store's previous and present profits or losses").

[21] In 1994 and 1995, Premier and RDC were involved in a joint venture known as Roberts Road, L.P. In 1995, Premier and Lane himself were involved in a second joint venture known as Lane/Dunwoody Green Property, LLC. In both projects, Premier shared development fees, sales fees and profits with Lane and his companies.

[22] OCGA § 23-2-58.

[23] *Bowen v. Hunter, Maclean, Exley & Dunn*, 241 Ga. App. 204, 207 (2) (525 SE2d 744) (1999).

[24] See *Griffin v. Fowler*, 260 Ga. App. 443, 445 (1) (579 SE2d 848) (2003).

Even if we assume that a confidential relationship existed in this case and that Lane breached his fiduciary duty, in light of our holding in Division 3 (a), Lane is entitled to summary judgment on Premier's claim for breach of fiduciary duty.

To the extent Premier alleges in its complaint that defendants, other than Lane, breached fiduciary duties to Premier, Premier does not address these claims in its brief. The claims are therefore deemed abandoned or waived.[25]

(c) Finally, Premier argues that a material fact exists as to whether defendants other than Lane conspired to aid and abet Lane in the breach of his fiduciary duty to Premier. Premier contends that whether or not Georgia has a cause of action for aiding and abetting conspiracy to breach a fiduciary duty is an issue of first impression. We need not reach the issue, however, since Premier's underlying breach of fiduciary duty claim fails.

> A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means. To recover damages for a civil conspiracy claim, a plaintiff must show that two or more persons, acting in concert, engaged in conduct that constitutes a tort. Absent the underlying tort, there can be no liability for civil conspiracy.[26]

In this case, because the underlying tort claim fails, Premier cannot maintain a cause of action for conspiracy to breach a fiduciary duty.

*Judgment affirmed. Blackburn, P. J., and Barnes, J., concur.*

DECIDED MARCH 3, 2005 —
RECONSIDERATION DENIED APRIL 13, 2005 — 

*James N. Cline,* for appellant.
*Seyfarth Shaw, John A. Sherrill, Stephen M. Parham, Balch & Bingham, Cary Ichter, David G. Michell, Duncan & Mangiafico, George E. Duncan, Jr.,* for appellees.

---

[25] Court of Appeals Rule 25 (c) (2).

[26] *Miller v. Lomax,* 266 Ga. App. 93, 103 (4) (596 SE2d 232) (2004), citing *Mustaqeem-Graydon v. SunTrust Bank,* 258 Ga. App. 200, 207 (6) (573 SE2d 455) (2002) (because plaintiff's underlying fraud claim failed, he could not maintain an action for conspiracy to defraud). See also *R. W. Holdco, Inc. v. Johnson,* 267 Ga. App. 859, 866 (2) (a) (601 SE2d 177) (2004) (where defendant vice president had apparent authority to enter into transaction, claim that corporate plaintiff's former attorneys and accountants aided, abetted and assisted vice president in defrauding plaintiff failed).