[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-14362

_____

D.C. Docket No. 1:10-cv-00298-JOF

ANGELA HARRIS, et al.,

Plaintiffs-Appellants,

versus

LIBERTY COMMUNITY MANAGEMENT, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(December 19, 2012)

Before TJOFLAT, CARNES and JORDAN, Circuit Judges.

JORDAN, Circuit Judge:

The Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 et seq.,

"imposes civil liability on 'debt collector[s]' for certain prohibited debt collection

practices," *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 130 S.Ct. 1605,

1608 (2010), but also exempts some individuals and entities from its provisions. The exemption at issue in this appeal, § 1692a(6)(F)(i), provides that the Act does not apply to persons or entities "collecting or attempting to collect any debt owed . . . another to the extent such activity is incidental to a bona fide fiduciary obligation," and the question presented is whether this exemption applies to a management company which collects unpaid assessments on behalf of a homeowners association. We hold that it does, so long as the collection of such assessments from homeowners is not central to the management company's fiduciary obligations.

**I**

The plaintiffs – Angela Harris, Dijana Maser, Hortense Gordon, Izett Gordon Sharon Rufus, and Adreana Harris – are homeowners in the Little Suwanee Point townhouse community located near Atlanta. The community is governed by the Little Suwanee Point Homeowners Association, Inc., and all the homeowners in the community pay monthly assessments to the Association for the management of the community, maintenance of the common areas, and water service. Each homeowner pays a uniform fee for water because the townhouses in the community do not have individual water meters.

Liberty Community Management Inc., a property management company, does work for more than 100 homeowners associations in the Atlanta metropolitan area.

2

In June of 2008 the Little Suwanee Point Homeowners Association contracted with Liberty to manage Little Suwanee Point and handle a number of matters for the Association.

Under the management agreement, Liberty acts as the Association's "sole and exclusive [a]gent." For example, Liberty enters into contracts for regular maintenance of the community's common areas and facilities, including lawn care, pool maintenance, and vermin extermination. In addition, Liberty negotiates contracts in the name of the Association for electricity, gas, fuel, oil, and water; purchases and maintains property insurance, other liability insurance, and bonds for the Association, the board of directors, and members of the board; investigates all accidents and claims; and makes all necessary reports to insurance companies.

Liberty also prepares a budget for the Association and submits it to the Association's board of directors. It maintains the books and records of the Association, and must establish a financial accounting system for the affairs of the Association. In connection with these tasks, Liberty keeps the bank accounts of the Association, making deposits of all monies collected on behalf of the Association and drawing checks in the Association's name; prepares the monthly financial report showing the Association's annual budget and income and expenditures to date;

3

receives and reconciles the monthly bank statements for the Association; handles the general ledger; and assists the Association with its yearly tax filings.

One of Liberty's specific duties involves the collection of assessments as they become payable from homeowners. The management agreement authorizes Liberty, as "[a]gent" of the Association, to "request, demand, collect, receive and invoice for any and all charges and assessments due the Association" and to take action in order to recover delinquent assessments. The agreement specifically provides that "[e]verything done by [Liberty] under the provisions of this Agreement shall be done as [a]gent of the Association."

When Liberty first became the property manager of the Little Suwanee Point community, the Association was experiencing severe financial difficulties because many homeowners were not paying the required assessments. As a result of the delinquencies, the Association had been required to raise the monthly assessments for four consecutive years. Of the $183 monthly assessment paid by each homeowner in 2008, $37.84 was attributable to covering shortfalls caused by those who had failed to pay their assessments. By September of 2009, 89 of the 252 homeowners – including the plaintiffs – collectively owed over $140,000 in unpaid assessments and related charges.

In an attempt to address this ongoing problem, the Association proposed the following amendment to its governing declarations:

> If any assessment(s), fine(s), and/or charge(s) remain unpaid more than thirty (30) days after the due date(s), the Association, acting through the Board, shall have the right to suspend water services to the Lot paid for as a common expense by the Association; provided, however, such outstanding assessment(s), fine(s), and/or charge(s) must total more than Seven Hundred Fifty Dollars ($750.00). Prior to suspending water to a Lot, the Board or its agent shall send to the Owner at least three (3), separate written notices of its intention to suspend such water services. Any costs incurred by the Association in discontinuing and/or reconnecting any water service, including reasonable attorney's fees actually incurred, shall be an assessment against the Lot. The water service shall not be required to be restored until all amounts owed by the Owner have [sic] paid in full and the expense to disconnect and/or reconnect the water service have been paid in full.

Pursuant to the declarations of the Association, 67% of the homeowners had to approve the amendment in order for it to become effective.

The Association undertook a significant campaign to inform the community about the proposed amendment, including mailing notices to homeowners, discussing the amendment at three Association meetings, and knocking on homeowners' doors seeking support for the amendment. The amendment was ultimately approved by 70% of the homeowners in early July of 2009.

5

In August of 2009 Liberty sent out the first set of letters to the 19 homeowners who owed more than $750 in past due assessments, warning them that their water service would be disconnected if they failed to pay their overdue assessments. After receiving this warning, 12 homeowners agreed to a payment plan. The remaining homeowners – including the plaintiffs – had their water service suspended.

After unsuccessfully trying to have their water service reconnected in state court, the plaintiffs filed this suit in federal court. In relevant part, their complaint alleged that Liberty was a "debt collector" under the FDCPA and was civilly liable for violating several of the Act's provisions (e.g., by threatening to terminate, or terminating, water service), and that Liberty had violated Georgia's Fair Business Practices Act (GFBPA), GA. CODE ANN. § 10-1-390 *et seq*.[1] The district court eventually granted summary judgment to Liberty. It concluded that Liberty came within the § 1692a(6)(F)(i) exemption because the collection of the overdue assessments was "incidental to a bona fide fiduciary obligation," and that Liberty did not violate the GFBPA by threatening to terminate, or terminating, the plaintiffs' water service. On appeal, the plaintiffs challenge both of these rulings.

---

[1] Significantly, the plaintiffs never denied that their arrearages were over $750.

**II**

The district court's grant of summary judgment is subject to plenary review. *See, e.g.*, *Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1175 (11th Cir. 2012). "We will affirm if, after construing the evidence in the light most favorable to the non-moving party, we find that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1263-64 (11th Cir. 2010).

**A**

Congress enacted the FDCPA to "eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e)(a). The Act restricts the practices that debt collectors may employ to obtain information about debtors or collect on debts. For example, the Act prohibits a debt collector from "engaging in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of debt," § 1692d, and from using "unfair or unconscionable means to collect or attempt to collect any debt," § 1692f.

The Act's restrictions apply only to "debt collectors," who are defined as "any person[s] who use[ ] any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collect[ ] or attempt[ ] to collect, directly or indirectly, debts owed or due

7

or asserted to be owed or due another." § 1692a(6).  But not all who collect debts are "debt collectors" for purposes of the Act. There are exemptions for those who collect debts in limited situations, including government employees acting in their official capacity, certain non-profit credit counseling services, and officers and employees of creditors.  *See* §§ 1692a(6)(A)-(F).

At issue here is § 1692a(6)(F)(i), which exempts persons or entities "collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity is incidental to a bona fide fiduciary obligation." For the reasons which follow, we agree with the district court that Liberty comes within this statutory exemption.

First, Liberty owed a fiduciary obligation to the Association. Everything that Liberty did pursuant to the management agreement – including the collection of unpaid assessments and the enforcement of the amendment to the Association's governing declarations – was as the agent of the Association, and under Georgia law a "confidential relationship" exists "where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, *such as the relationship between partners, principal and agent, etc.*" GA. CODE ANN. § 23-2-58 (emphasis added). *See Premier/Georgia Mgmt. Co., Inc. v. Realty Mgmt.*

8

*Corp.*, 613 S.E.2d 112, 118 (Ga. Ct. App. 2005) (explaining that a confidential relationship gives rise to a fiduciary duty); *Nilan's Alley, Inc. v. Ginsburg*, 430 S.E.2d 368, 369 (Ga. Ct. App. 1993) (salesman, who was agent for manufacturer's representative in soliciting offers to purchase products, owed a fiduciary duty to representative). *See also Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 672 (7th Cir. 2004) ("agency is a fiduciary relationship in which the agent has the power to act on the principal's behalf").

Second, the collection of unpaid assessments was "incidental" to Liberty's "bona fide fiduciary obligation[s]" to the Association. The word "incidental," in common parlance, means "occurring as something casual or of secondary importance," 1 Shorter Oxford English Dictionary 1343 (5th ed. 2002), and here debt-collection activities were not central to, or the primary purpose of, Liberty's wide-ranging duties under the management agreement. *See Wilson v. Draper & Goldberg, P.L.L.C.*, 443 F.3d 373, 377-78 (4th Cir. 2005) (debt collection is not "incidental" under § 1692a(6)(F)(i) if it is "central" to, or the "primary purpose of," an entity's fiduciary obligations); *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1034 (9th Cir. 2009) (same). As noted earlier, Liberty did much more than just collect assessments for the Association and its homeowners; it also contracted for maintenance of the community's common areas, obtained utilities (including gas,

9

electricity, and water), purchased insurance, investigated claims, made reports to insurance companies, kept and maintained ledgers and bank accounts, deposited money and wrote checks, reconciled monthly bank statements, and assisted the Association with its yearly tax filings.

Our decision is consistent with the only published decision resolving the same question on similar facts. *See Berndt v. Fairfield Resorts, Inc.*, 339 F. Supp. 2d 1064, 1068 (W.D. Wis. 2004). It also squares with our prior interpretation of § 1692a(6)(F)(i). *See Pelfrey v. Educ. Credit Mgmt. Corp.*, 208 F.3d 945, 945 (11th Cir. 2000) (holding that nonprofit guaranty agency was exempted under § 1692a(6)(F)(i) because its collection of student loan debts was incidental to its many other duties) (citing to the district court's more thorough opinion, *Pelfrey v. Educ. Credit Mgmt. Corp.*, 71 F. Supp. 2d 1161, 1172-74, 1179-80 (N.D. Ala. 1999)). *Cf. Turner v. Hawaii First, Inc.* ___ F. Supp. 2d ___, ___, 2012 WL 4903314, at *6 (D. Haw. Oct. 15, 2012) (denying motion to dismiss FDCPA claim because it was not clear from the complaint whether debt collection activities by condominium management company were incidental to its fiduciary duties).

The plaintiffs nevertheless contend that reversal is warranted because the FDCPA is to be interpreted broadly in favor of coverage. They point to the Federal Trade Commission's commentary to the FDCPA, which states that § 1692a(6)(F)(i)

10

"applies to entities such as trust departments of banks" and "escrow companies," but does not include "a party who is named as a debtor's trustee solely for the purpose of conducting a foreclosure sale." *See* Statements of General Policy or Interpretation – Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed. Reg. 50097, 50103 (Fed. Trade Comm'n Dec. 13, 1988). The FTC staff commentary, however, does not help the plaintiffs here. Liberty, on the record before us, did not act "solely" to collect past due assessments for the Association.

**B**

The Georgia Fair Business Practices Act (GFBPA), GA. CODE ANN. § 10-1-390 *et seq.*, provides a state law remedy for acts made unlawful under the Federal Trade Commission Act, 15 U.S.C. § 41-58, and lists additional practices that are prohibited under state law.  The GFBPA, which is to be interpreted and construed consistently with the Federal Trade Commission Act, *see* GA. CODE ANN. § 10-1-391(b), applies to unfair practices in the collection of debts and a violation of the FDCPA constitutes a violation of the GFBPA. *See 1st Nationwide Collection Agency v. Werner*, 654 S.E. 2d 428 (Ga. Ct. App. 2007). The plaintiffs, as noted above, assert that Liberty violated the GFBPA by threatening to terminate, or terminating, their water service.

11

According to the plaintiffs, whether Liberty engaged in an unfair business practice is a matter for a jury to resolve. But the FDCPA case they cite for this proposition does not go that far, as it involved what inferences could fairly be drawn from a collection letter. *See Leblanc v. Unifund CCR Partners, ZB*, 601 F.3d 1185, 1195 (11th Cir. 2010) ("Determining whether Unifund's [dunning] letter could reasonably be perceived as a 'threat to take legal action' under the 'least-sophisticated consumer' standard in the circumstances of this case is best left to jury decision."). When, as here, there are no disputed facts and the only issue is the application of law to the undisputed facts, a court may decide at the Rule 56 stage that one side or the other is entitled to judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)*. See also Small v. Savannah Int'l Motors, Inc.*, 619 S.E.2d 738, 742 (Ga. Ct. App. 2005) (granting summary judgment to defendant in GFBPA case).  Under Georgia law, moreover, a court may determine what constitutes a violation of the GFBPA as a matter of law. *See, e.g.*, *Henderson v. Gandy*, 608 S.E.2d 248, 253 (Ga. Ct. App. 2004) (holding that certain individual transactions did not violate the GFBPA because they were not the types of practices the Act meant to regulate).

The district court correctly concluded that Liberty's actions did not violate the GFBPA as a matter of law.  The Act, which was designed to prohibit unfair and deceptive acts and practices against consumers, *see* GA. CODE ANN. § 10-1-391,

12

specifies 34 practices, "[b]y way of illustration only and without limiting the scope" of the Act's prohibitions, *see* § 10-1-393(b), as unfair or deceptive. Significantly, not a single one of those specified practices comes close to resembling the actions at issue here. Every specified practice involves defendants making misrepresentations, causing misunderstandings, using deception, or failing to provide notice when notice is required. Nothing in the GFPBA arguably implies that it is unfair or deceptive for a homeowners association or its management company, after providing notice, to stop water service for admitted nonpayment (particularly where the other homeowners have to pay higher assessments as a result of the delinquencies). Indeed, a natural consequence of a person's failure to pay for a service is that, at some point, the service provider may refuse to continue to provide that service. *Cf. Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 10 n.9 (1978) (noting that, under common law, a utility is entitled "to terminate service for nonpayment of an undisputed charge").[2]

### III

---

[2] The plaintiffs contend that they need not provide any case law (or other authority) to support their interpretation of the GFBPA. That contention, given what we have discussed in the text, is untenable.

13

Liberty is not a debt collector under § 1692a(6)(F)(i) of the FDCPA, and its actions did not violate Georgia's Fair Business Practices Act. The  district court's grant of summary judgment in favor of Liberty is therefore affirmed.

**AFFIRMED**.