**THIRD DIVISION
DILLARD, C. J.,
GOBEIL and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**June 24, 2019**

# In the Court of Appeals of Georgia

A19A0548. JANET BEAROFF, et al. v. CHARLES THOMAS CRATON, III, et al.

A19A0549. CHARLES THOMAS CRATON, III, et al. v. JANET BEAROFF, et al.

GOBEIL, Judge.

These companion appeals arise out of a lawsuit filed in the Superior Court of Floyd County by Janet Bearoff, JBear, LLC, and JDream, LLC, d/b/a Frisky Biscuit Couples Boutique (collectively, "Plaintiffs") against Charles Thomas Craton, III and Craton Entertainment, LLC, d/b/a The Love Library (collectively, "Defendants").[1] The complaint asserted claims for breach of a non-compete agreement, aiding and abetting the breach of that agreement, conversion and misappropriation, and

---

[1] Also named as defendants in the complaint were Shannon Video, d/b/a Entice Couple's Boutique, and High Five Investments, LLC. The case did not proceed to trial against those defendants, and they are not parties to this appeal.

violations of Georgia's Uniform Deceptive Trade Practices Act ("UDTPA") (OCGA § 10-1-370, et seq.)[2] The relief sought by the Plaintiffs included compensatory and punitive damages, injunctive relief, attorney fees, and an equitable extension of the expiration date of the non-compete agreement at issue. Following a hearing on the Plaintiffs' request for a preliminary injunction, the trial court entered an order granting that relief and enjoining the Defendants from operating The Love Library. The Defendants appealed that order and while the appeal was pending, the non-competition period expired. This Court then dismissed the appeal for lack of jurisdiction.

Following remittitur, the Defendants moved for summary judgment. The trial court granted that motion in part, finding that as a matter of law, it could not equitably extend the non-compete period. The case thereafter proceeded to a bench trial on the Plaintiffs' remaining claims, with the court finding in the Plaintiffs' favor. The trial court awarded the Plaintiffs injunctive relief and nominal and punitive damages. The court declined to award attorney fees to either party, finding that neither had

---

[2] The Plaintiffs also asserted a claim for tortious interference with contractual relations, but did not pursue that claim at trial.

presented any evidence at trial as to the amount or reasonableness of any fees they were seeking.

In Case No. A19A0548, the Plaintiffs appeal the trial court's grant of summary judgment in favor of the Defendants on the Plaintiffs' claim seeking an equitable extension of the non-compete agreement. They also appeal the order of judgment, arguing that the trial court erred in declining to award them compensatory damages and in failing to hold a post-judgment hearing on their request for attorney fees under the UDTPA. In Case No. A19A0549, the Defendants appeal the order of judgment, asserting that the trial court erred in finding for the Plaintiffs on their conversion claim, in awarding damages to Bearoff in her individual capacity, and in awarding damages for misappropriation of a trade name. The Defendants also challenge the trial court's punitive damages award.

For reasons explained more fully below, in Case No. A19A0548, we affirm both the grant of partial summary judgment in favor of the Defendants and the award of nominal damages. We find, however, that the Plaintiffs were entitled to a post-judgment hearing on their claim for attorney fees under the UDTPA. Accordingly, we vacate that part of the judgment finding that the Plaintiffs were not entitled to recover attorney fees, and remand for a hearing on the question of attorney fees under the

UDTPA. Additionally, we find no merit in any of the claims of error asserted by the Defendants in Case No. A19A0549. We therefore affirm the order of judgment against Charles Craton and Craton Entertainment.

On an appeal from a judgment entered following a bench trial, we view the evidence in the light most favorable to the judgment, giving due deference to the trial court's credibility determinations. *Gibson v. Gibson*, 301 Ga. 622, 624 (801 SE2d 40) (2017). We will not disturb the trial court's factual findings if there is any evidence to support them, but we review de novo any questions of law decided by that court. *Champion Windows of Chattanooga v. Edwards*, 326 Ga. App. 232, 233 (756 SE2d 314) (2014).

Viewed in the light most favorable to the judgment, the record shows that in 2005, Bearoff, Kenneth Gabler (who at the time was married to Bearoff), and Susan Craton (who at the time was married to Charles Craton) formed two companies: High Five Investments, LLC ("High Five") and Shannon Video, Inc. Bearoff and Gabler each owned 25% of the common stock in both corporations, and Susan Craton owned the remaining 50% of stock in each company. High Five purchased a commercial property in Rome (the "Property") and then leased the Property to Shannon Video, which opened a retail business thereon in May 2006. The business, Entice Couple's

4

Boutique ("Entice"), was an "adult store," meaning it sold lingerie, tobacco, adult movies, sexual aids, and other adult-themed, sexually-oriented products.

In 2009, Bearoff and Gabler agreed to sell their interests in High Five and Shannon Video to Susan Craton. On December 10, 2009, the parties executed a Stock/Membership Unit Redemption Agreement (the "Redemption Agreement"), under which Susan Craton agreed to purchase Bearoff's and Gabler's interests in both companies for $505,000.00. At the time of the sale, Susan Craton paid Bearoff and Gabler $55,000 in cash and provided them with a non-negotiable promissory note (the "Promissory Note") executed by Shannon Video and High Five. The Promissory Note provided that High Five and Shannon Video would pay Bearoff and Gabler $450,000 plus interest in equal monthly installments of approximately $6,000 for a period of 81 months. The Promissory Note was secured by a deed to secure debt and an assignment of leases and rents executed by High Five[3]; a commercial security agreement (the "Security Agreement") executed by Shannon Video[4]; and an

---

[3] The deed to secure debt conveyed and transferred to Bearoff and Gabler all of High Five's rights, title, and interest in and to the Property; the assignment of leases and rents assigned to Bearoff and Gabler all of High Five's rights, title, and interest in and to the leases and rents generated by the Property.

[4] The Security Agreement granted to Bearoff and Gabler a lien and security interest in all inventory, business records, data, and general intangibles owned by

Unconditional Guaranty of Payment and Performance executed by both Susan and Charles Craton (the "Guaranty").[5] (Collectively, these documents are referred to as the "Security Documents.")

The Redemption Agreement incorporated a separate, non-competition agreement (the "Non-Compete"), to which Bearoff, Gabler, Shannon Video, High Five, and Charles and Susan Craton were all parties. The Non-Compete stated that the necessity for the agreement arose from "the fact that the financed portion of the purchase price under the [Redemption Agreement] [was to] be paid from revenues generated by the sales of adult novelties by Shannon Video," and the competitive activities would impair Shannon Video's ability to make the required payments. The Non-Compete prohibited both Charles and Susan from engaging in any activity that competed with the business of Shannon Video or High Five.[6] Specifically, under the

---

Shannon Video, d/b/a Entice Couples Boutique.

[5] Under the Guaranty, Charles and Susan Craton guaranteed the payment and performance of the obligations under the Redemption Agreement, the Promissory Note, the deed to secure debt, the assignment of leases and rents, and the Security Agreement.

[6] The Non-Compete defined the business of Shannon Video and High Five to be that of "market[ing] and sell[ing] adult novelties to residents of [the counties]" covered by the Non-Compete.

terms of the Non-Compete, both Charles and Susan, together with Shannon Video

and High Five, agreed "[f]or a period of eighty-one (81) months following the date

of execution of this Agreement . . . not to engage in any Competitive Activity[7]

---

[7] The Agreement defines "competitive activity" as:
(i) doing business, opening one or more retail outlets or businesses in the Non-Compete Area or providing products or services substantially similar to those provided by the business of Shannon Video and High Five . . . or soliciting any [c]ustomers of Shannon Video or High Five in the Non-Compete Area for the purpose of providing products or services substantially similar to those provided by Shannon Video and High Five . . . ; (ii) serving as an officer, director, member, manager, consultant, advisor, agent[,] or representative of any person, corporation, partnership, limited liability company, sole proprietorship, association, or other business enterprise engaged in the same or similar business as Shannon Video and High Five (each a "Competitive Enterprise"); (iii) owning or acquiring, directly or indirectly, any interest in any Competitive Enterprise; (iv) soliciting or inducing any partner, stockholder, principal, director, officer, employee, agent or other representative of Shannon Video and High Five to leave the employ or retention of Shannon Video or High Five[;] or (v) requesting or advising, explicitly or implicitly, either individually or through any other person or entity, any [c]ustomer of Shannon Video or High Five . . . to withdraw, curtail or cancel its business relationship with Shannon Video or High Five.

within Floyd County, Georgia or any of the counties located in the States of Georgia and Alabama contiguous to Floyd County, Georgia."

In early 2012, at the request of the Cratons, the parties entered into two additional agreements, one of which modified the Promissory Note and the other of which modified the Redemption Agreement. Charles Craton signed both of these modification agreements. The modification agreements increased the interest on the balance due to 5% annually; extended the term of the Promissory Note and other Security Documents for a period of 96 months, beginning January 1, 2012 (meaning those documents now had a maturity date of January 1, 2020); reduced the monthly payments by approximately $2,000; and provided that Gabler had the right to transfer and assign his interest in the Promissory Note and other Security Documents to Bearoff.[8] Gabler thereafter assigned to Bearoff his interest in all Security Documents in October, 2012. .

In April 2013, the Cratons filed a voluntary joint petition under Chapter 7 of the Bankruptcy Code. Two months later, the Cratons were divorced and, as part of the divorce settlement, Susan Craton transferred all of her interests in High Five and

---

[8] While the Non-Compete had been drafted to run for the original payment period of 81 months, the parties did not seek to extend that period, even though they were extending the terms of the Promissory Note and other Security Documents.

8

Shannon Video to Charles.[9] . On November 5, 2013, the Cratons received a discharge in their bankruptcy case.

Shortly after the Cratons' personal bankruptcy discharge, the payments due under the Promissory Note ceased, leaving an outstanding principal balance of approximately $250,000. After failing to make payments for December 2013 and January and February 2014, Charles Craton emailed Bearoff that Entice (and therefore High Five and Shannon Video) was experiencing significant financial difficulties and asked her to forgive the balance owed under the Promissory Note. Bearoff thereafter issued a formal notice of default in which she demanded full payment of the principal and interest owed under the Promissory Note, as well as attorney fees. Craton made no further payments on the amount owed Bearoff.

On December 29, 2014, Shannon Video filed a voluntary Chapter 11 bankruptcy petition, and that proceeding subsequently was converted to a Chapter 7 bankruptcy liquidation. Craton closed the Entice Boutique in July of 2015. Following the bankruptcy filing, and in preparation for foreclosing on her security interests in

---

[9] Although the relevant documents required that the Cratons obtain Bearoff's permission before effectuating this transfer, they did not do so.

High Five and Shannon Video, Bearoff formed JBear, LLC and JDream, LLC.[10] In November 2015, Bearoff assigned all of her right, title, and interest in the Promissory Note, the High Five security deed, and the Redemption Agreement to JBear. Approximately three months later, JBear foreclosed on the security deed, and it now holds title to the Property. JBear leased the Property to JDream, which operates The Frisky Biscuit Couples Boutique thereon. Additionally, JBear foreclosed on the property of Shannon Video serving as collateral under the Security Agreement (including the Entice store inventory) and transferred the collateral to The Frisky Biscuit. Like Entice, The Frisky Biscuit is an adult store, selling items such as lingerie, tobacco products, adult movies, sexual aids, and other adult-themed, sexually-oriented products.[11]

Approximately five months after Entice closed, Bearoff learned that Craton was planning to open a new adult store within the area covered by the Non-Compete and that he was using Entice's social media accounts to advertise the new business.

_____

[10] Bearoff testified that although she was entitled to foreclose on the stock of Shannon Video and High Five, she elected not to do so because of the existing debt carried by those companies.

[11] Some of the items sold at The Frisky Biscuit were part of the Shannon Video/Entice inventory foreclosed upon by Bearoff.

10

On December 8, 2015, Bearoff sent Craton a cease-and-desist letter, notifying him that opening his planned store would be a violation of the Non-Compete. In response, Craton sent his own cease-and-desist letter to Bearoff, alleging that her planned opening of The Frisky Biscuit violated the Non-Compete. Two days later, on December 16, 2015, High Five (represented by Craton's attorneys) filed a lawsuit against Bearoff, JBear, and JDream, asserting claims for ejectment from and trespass upon the Property and a breach of the Non-Compete. The complaint sought injunctive relief, punitive damages, and attorney fees.[12]

Despite the cease-and-desist letter and the existence of the Non-Compete, Craton opened his new business, The Love Library, on December 18, 2015. The Love Library is owned by Craton Entertainment, LLC, which was formed in 2013 and whose sole member is Craton's daughter, Calley Craton. The evidence at trial showed that Charles Craton is the registered agent for Craton Entertainment, that he negotiated the retail lease for the space housing The Love Library, and that he personally guaranteed that lease. Additionally, Craton negotiated with vendors on behalf of Craton Entertainment and he serves as the President and CEO of The Love

---

[12] The record does not show the outcome of this lawsuit, but it appears that none of High Five's claims proceeded to trial, and we assume that the case is no longer pending.

11

Library. Craton also provided Calley with a small business loan to allow The Love Library to open, and at all times he has been the sole signatory on the Craton Entertainment bank accounts.

Both Craton and his daughter promoted The Love Library on social media accounts belonging to Shannon Video/Entice, and Calley Craton testified that she converted the Entice Facebook page to a Facebook page for The Love Library. The evidence also showed that another employee of The Love Library converted the Entice twitter account to an account for The Love Library. Dozens of social media posts promoting The Love Library included the Entice store logo and for some length of time, The Love Library displayed on its property, next to its own sign, a sign featuring the Entice store logo. And on December 14, 2015, Charles Craton filed a trademark application for Entice Couple's Boutique, representing that the mark was owned by Craton Entertainment.

In January 2016, the Plaintiffs initiated the current lawsuit. Two years later, the case proceeded to a bench trial and, after hearing the evidence, the court found in favor of the Plaintiffs. In its order of judgment, the trial court found that the Non-Compete is valid and enforceable and survived Craton's bankruptcy discharge; Craton's opening of The Love Library violated the Non-Compete; the breach of the

Non-Compete was aided and abetted by Craton Entertainment; the Defendants misappropriated the Entice and Entice Couple's Boutique trade names; the Defendants unlawfully converted Shannon Video's social media accounts;[13] and the Defendants violated the UDTPA. The court further found that the Plaintiffs had failed to prove their compensatory damages with the requisite specificity. Accordingly, the court awarded Janet Bearoff, individually, $1,000 in nominal damages against Craton and Craton Entertainment on her claim for breach of the Non-Compete agreement. The court also awarded the Plaintiffs $1,000 in nominal damages for conversion of the Entice trade name and social media accounts and $50,000 in punitive damages against the Defendants, jointly and severally. The order permanently enjoined the Defendants from using the trade names Entice and Entice Couple's Boutique. Finally, although the court found that the Defendants had violated the UDTPA, it made no findings as to whether their conduct was willful, so as to warrant an award of attorney fees under that statute. Instead, the court stated that it was declining to award attorney fees based on any statutory provision under which either party had claimed such fees,

---

[13] As discussed more fully below, on appeal, the Defendants challenge only the findings that they misappropriated the Entice trade name and that they unlawfully converted the social media accounts.

13

because neither party had presented at trial any evidence as to the amount or reasonableness of any fees they might be seeking.[14]

Following the entry of judgment, the Plaintiffs filed a motion to amend or modify that order to reflect that they were entitled to attorney fees under the UDTPA. The Plaintiffs also sought a post-judgment hearing as to the amount of fees to which they were entitled. Before the trial court ruled on that motion, both the Plaintiffs and the Defendants filed their respective notices of appeal.

*Case No. A19A0548*

1. Bearoff[15] contends that the trial court erred in granting summary judgment to Craton on her claim seeking an equitable extension of the Non-Compete until such

---

[14] On appeal, the Plaintiffs challenge only the trial court's refusal to award them fees under the UDTPA.

[15] As noted above, the trial court held that because neither JBear nor JDream was a party to the Non-Compete, neither could seek to enforce that agreement or recover for breach thereof. The Plaintiffs have not challenged that finding on appeal.

14

time as the amounts due under the Promissory Note and Guaranty are paid.[16] We disagree.

In support of this argument, Bearoff relies on the well-established principle that when interpreting a contract, "the cardinal rule of . . . construction is to ascertain the intent of the parties." *Miller v. GGNSC Atlanta*, 323 Ga. App. 114, 118 (2) (746 SE2d 680) (2013). Bearoff further relies on OCGA § 13-8-57 (d), which provides that when a non-compete agreement involves the owner or seller of a business, "a court shall presume to be reasonable in time any restraint . . . equal to the period of time during which payments are being made to the owner or seller as a result of any sale [of the business]."[17] Bearoff argues that although the Non-Compete provided for a term of

---

[16] In their brief, the Defendants contend that Bearoff has waived her right to challenge this ruling on appeal because she failed to appeal the summary judgment order at the time it was entered and because she failed to request at trial an equitable extension of the Non-Compete. This argument reflects a misunderstanding of Georgia law. After the trial court granted summary judgment against Bearoff on this claim for relief, she could not thereafter seek that relief at trial. See *Smith v. Lockridge*, 288 Ga. 180, 185 (4) (702 SE2d 858) (2010) (a "grant of summary judgment . . . constitutes an adjudication on the merits"). Furthermore, under OCGA § 5-6-34 (d), a party may challenge on appeal "all judgments, rulings, or orders rendered in the case which are raised on appeal and which may affect the proceedings below . . ."

[17] This statute became effective on May 11, 2011, after the initial Redemption Agreement and relevant Security Documents were executed, but before the parties executed the amendments to those agreements.

15

81 months (until September 16, 2016), other language in the Non-Compete reflects that the parties intended for the agreement to be in effect as long as money was owed under the Redemption Agreement and Promissory Note. Thus, equitably extending the non-compete period until Craton has satisfied his obligations to Bearoff would effectuate the intent of the parties. Moreover, Bearoff reasons that the existence of OCGA § 13-8-57 (d) shows that an equitable extension of the non-compete period until the amount owed under the Redemption Agreement and related documents is paid would not violate Georgia's public policy. We find these arguments unpersuasive.

We first note that the Georgia Supreme Court has rejected – at least implicitly – the idea that equity permits a court to extend the period of a non-compete agreement. See *Elec. Data Systems Corp. v. Heinemann*, 268 Ga. 755, 757 (3) (493 SE2d 132) (1997); *Coffee Systems of Atlanta v. Fox*, 227 Ga. 602, 602 (182 SE2d 109) (1971). The non-compete at issue in *Coffee Systems* prohibited an employee from engaging in competitive acts for 12 months following the termination of his employment. 227 Ga. at 602. The employee left his job in November 1969 and began engaging in competitive activities almost immediately thereafter. Id. The employer sued and sought a preliminary injunction, but during the pendency of the litigation,

16

the non-compete period expired. The employer thereafter argued that the litigation tolled the running of the non-compete period, but our Supreme Court rejected that argument, reasoning that "[s]uch an extension would in effect rewrite the one-year feature of the agreement. Courts do not make contracts for the parties. The contingency of litigation could have been provided for in the agreement, but was not." Id.

More than 25 years after deciding *Coffee Systems*, the Georgia Supreme Court declined an express invitation to overrule the case and again rejected the argument that where a party sues to enforce a non-compete agreement, the litigation should toll the running of the agreement's term. *Elec. Data Systems*, 268 Ga. at 757 (4). In doing so, the Court reiterated its reluctance to engage in judicial reformation of contracts, explaining "[t]he court should hesitate to rewrite private contracts. Judicially providing a tolling provision would affect such a rewrite. Private parties are able to include reasonable tolling provisions in their own contracts." Id. (footnotes omitted).

Both *Coffee Systems* and *Electric Data Systems* reflect Georgia's rules of contract interpretation. Specifically, while Georgia courts look for the intent of the parties when enforcing a contract, they also presume that the intent is reflected in the contractual language. *Miller*, 323 Ga. App. at 118 (2) (courts ascertain the intent of

17

the parties to the contract by looking to the language of the contract). Thus, where the language at issue is plain and unambiguous, we presume that the parties meant what they said and we simply enforce the contract as written. *S-D RIRA, LLC v. Outback Property Owners' Assn.*, 330 Ga. App. 442, 453 (3) (c) (765 SE2d 498) (2014). See also *Omni Builders Risk v. Bennett*, 325 Ga. App. 293, 296 (1) (750 SE2d 499) (2013) ("[w]here the language of the contract is plain and unambiguous. . . no construction is required or permissible and the terms of the contract must be given an interpretation of ordinary significance") (citation and punctuation omitted). Put another way, under Georgia law, this Court is "not at liberty to ignore the specific terms of the parties' written agreement and rewrite or revise a contract under the guise of construing it." *Miller*, 323 Ga. App. at 123 (2) (citation and punctuation omitted). See also *Roquemore v. Burgess*, 281 Ga. 593, 595 (642 SE2d 41) (2007) ("[i]t is the function of the court to construe the contract as written and not to make a new contract for the parties") (citation and punctuation omitted); *Hamrick v. Kelley*, 260 Ga. 307, 308 (392 SE2d 518) (1990) ("a trial court may not under the guise of the 'blue pencil' method" reform or amend the plain terms of a covenant not to compete).

Here, the terms of the Non-Compete are clear and capable of only one construction: the Agreement was effective "[f]or a period of eighty-one (81) months

18

following the date of execution of [the Non-Compete]." Thus, the non-compete period began on December 16, 2009 and ended on September 16, 2016. Moreover, although the parties subsequently amended the Redemption Agreement and the Promissory Note to reflect a maturity date of January 1, 2020, the parties did not amend the Non-Compete so as to extend its term. Accordingly, given the general rules of contract construction we are obligated to apply, the relevant precedent related to non-compete agreements, and the parties' failure to extend the non-compete term at the time they extended the maturity date on the purchase alone, we find no error by the trial court in refusing to grant an equitable extension of the time period covered by the Non-Compete.

2. The Plaintiffs assert that the trial court erred in refusing to award them compensatory damages. Again, we disagree.

Although the Plaintiffs sought to recover as damages their lost profits, the only evidence of damages they presented at trial showed The Love Library's gross profit from its opening on December 18, 2015 until the expiration of the Non-Compete on September 16, 2016. The trial court interpreted this evidence as meaning that the Plaintiffs were seeking disgorgement of The Love Library's profits and noted that because the Plaintiffs had not asserted a breach of fiduciary duty claim, they were not

entitled to disgorgement. See *Jennette v. Nat. Community Dev. Svcs.*, 239 Ga. App. 221, 224 (3) (520 SE2d 231) (1999) (disgorgement of profits is an appropriate remedy for business opportunities acquired as the result of a breach of fiduciary duty). On appeal, the Plaintiffs challenge this finding, arguing that because The Love Library was the only other adult store operating within the non-compete area, The Love Library's profits represented the best evidence of the revenue lost by The Frisky Biscuit. This argument is not supported by Georgia law.

Lost profits are the measure of what the plaintiff lost as a result of the defendant's conduct. *McMillian v. McMillian*, 310 Ga. App. 735, 740 (713 SE2d 920) (2011). Thus, the amount the defendant gained through its tortious conduct may be probative of the plaintiff's loss, but that amount is not "dispositive of the amount of damages [the plaintiff] might be entitled to recover." Id. Accordingly, while the evidence in question may have been relevant to the issue of the Plaintiffs' lost profits, that evidence, standing alone, was insufficient to establish the amount of loss the Plaintiffs suffered as a result of the Defendants; conduct.

As we have explained before, "[t]he profits of a commercial business are dependent on so many hazards and chances, that unless the anticipated profits are capable of ascertainment, and the loss of them traceable directly to the defendant's

20

wrongful act, they are too speculative to afford a basis for the computation of damages." *Johnson County School Dist. v. Greater Savannah Lawn Care*, 278 Ga. App. 110, 112 (629 SE2d 271) (2006) (citation and punctuation omitted). Moreover, because "the question of damages cannot be left to speculation, conjecture and guesswork[,]" a plaintiff must prove its lost profits "with great specificity." *Premier/Georgia Mgmt. Co. v. Realty Mgmt. Corp.*, 272 Ga. App. 780, 785-786 (3) (a) (613 SE2d 112) (2005) (citation and punctuation omitted). Thus, to establish lost profits, the plaintiff must provide "information or data sufficient to enable [the trier of fact] to estimate the amount of the loss with reasonable certainty." *Pounds v. Hospital Auth. of Gwinnett County*, 197 Ga. App. 598, 599 (1) (399 SE2d 92) (1990) (citation and punctuation omitted). This "information or data" must include evidence showing that the business claiming lost profits had "a proven track record of profitability." *EZ Green Associates v. Georgia-Pacific Corp.*, 331 Ga. App. 183, 188 (2) (770 SE2d 273) (2015) (citation and punctuation omitted). The plaintiff must also show the expected profit for the relevant time period – i.e., they are required to show the business's projected revenues, as well as its projected expenses, for that time frame. *Johnson County*, 278 Ga. App. at 112 (as a general rule, to establish lost

21

profits, a plaintiff must provide "figures establishing the business's projected revenue as well as its projected expenses") (citation and punctuation omitted).

In this case, the Plaintiffs failed to present evidence showing that The Frisky Biscuit had a track record of profitability. Nor did they provide figures showing the store's anticipated revenues and expenses for the time period between December 18, 2015 and September 16, 2016. In the absence of such evidence, the gross profits of The Love Library during the relevant time frame failed to provide a sufficient basis for the trial court to calculate the Plaintiffs lost profits with reasonable certainty. See *Johnson County*, 278 Ga. App. at 113-114. Accordingly, we find no error by the trial court in refusing to award the Plaintiffs compensatory damages.

3. The Plaintiffs assert that the trial court erred in ruling on their claim for attorney fees under the UDTPA in the order of judgment, as they were entitled to a post-judgment hearing on that issue. In response, the Defendants assert that no legal authority supports the Plaintiffs' claim that they are entitled to a post-judgment hearing and therefore the trial court found correctly that the Plaintiffs' failure to present evidence of their fees at trial precluded them from recovering the same. The Defendants further contend that the Plaintiffs' failure to include the issue of attorney

fees under the UDTPA in their portion of the consolidated pretrial order means they have waived their right to seek such fees.

The question of whether a party is entitled to a post-judgment hearing on the issue of attorney fees under the UDTPA appears to be one of first impression in Georgia. To decide this question, therefore, we begin with the language of the UDTPA. See *Deal v. Coleman*, 294 Ga. 170, 172-173 (1) (a) (751 SE2d 337) (2013). That statute allows a plaintiff to sue a defendant for engaging in one or more of the unfair trade practices set forth in OCGA § 10-1-372 (a) (1) - (12). Although a plaintiff cannot recover monetary damages under the UDTPA, it can obtain equitable relief. *Akron Pest Control v. Radar Exterminating Co.*, 216 Ga. App. 495, 498 (2) (455 SE2d 601) (1995). Specifically, if a plaintiff can prove both that the defendant engaged in one or more deceptive trade practices and that the plaintiff is likely to be damaged by the defendant's conduct, the trial court may enjoin the defendant from engaging in such conduct "under the principles of equity and on terms the court considers reasonable." OCGA § 10-1-373 (a). Additionally, the statute provides that "[c]osts shall be allowed to the prevailing party unless the court otherwise directs." OCGA § 10-1-373 (b). Attorney fees may also be awarded to the "prevailing party." Id. In cases where the plaintiff is the prevailing party, the court, in its discretion, may

award attorney fees to the plaintiff if it finds that the defendant "willfully engaged in the trade practice knowing it to be deceptive." OCGA § 10-1-373 (b) (2). And where the defendant prevails, the court has the discretion to award attorney fees if it finds that the plaintiff "brought an action which he knew to be groundless." OCGA § 10-1-373 (b) (1).

While only a trial court can grant relief for a violation of the UDTPA, nothing in the statute prohibits the trier of fact from deciding the question of whether such a violation occurred. Indeed, our decisions have addressed the situation where a jury found a violation of the UDTPA and the trial court thereafter decided relief, based on the jury's factual findings. See *Trotman v. Velociteach Project Mgmt.*, 311 Ga. App. 208, 211 (2) (a) (715 SE2d 449) (2011) (holding that the evidence supported the jury's finding that defendant violated the UDTPA and therefore the trial court did not abuse its discretion by awarding equitable relief based on the jury's finding).

As the foregoing establishes, the UDTPA allows either the plaintiff or the defendant an opportunity to recover their attorney fees, depending on which of those parties is the "prevailing party." Although a fact finder may decide the issue of culpability under the statute (i.e., the question of which party prevails), only the trial court may award attorney fees. Given these facts, we find that, especially in situations

24

such as this, where an alleged UDTPA violation is one of several claims being tried, the statute contemplates a bifurcated proceeding. In other words, the statute anticipates that the fact finder will first determine the prevailing party before the trial court makes a decision as to whether an award of attorney fees is warranted. Logically, therefore, neither party would expect to present evidence as to their attorney fees during the trial.[18] See *McClure v. McCurry*, 329 Ga. App. 342, 343 (1) (765 SE2d 30) (2014) (because OCGA § 9-15-14 requires the trial court to decide whether an award of attorney fees is appropriate, the statute contemplates a post-judgment proceeding on the question of whether such fees are available). Cf. *Sims v. G.T. Architecture Contractors Corp.*, 292 Ga. App. 94, 96 (1) (663 SE2d 797) (2008) (where the question of attorney fees is to be decided by a jury, the plaintiff must present at trial evidence showing "the actual costs of his attorneys and the reasonableness of those costs").

In an effort to avoid any further proceedings, the Defendants argue that to be entitled to a bifurcated proceeding, where the question of attorney fees is the subject

---

[18] In the event of a bench trial, the trial court, in its discretion, could request that such evidence be submitted at trial. It seems to us, however, that the more efficient approach would be to hear attorney fee evidence only after the court has determined the prevailing party on the UDTPA claim.

of a post-trial hearing, the Plaintiffs were required to reference in the pretrial order the fact that: (1) if they prevailed on their UDTPA claim, they would be seeking attorney fees under that statute; and (2) in that event, they wished to present evidence of their fees at a post-trial hearing. We find no support for this argument in the law. As OCGA § 9-11-16 makes clear, a pretrial order frames and "limits the issues *for trial*." OCGA § 9-11-16 (b) (emphasis supplied). Where a claim for attorney fees is to be determined by the trial court, rather than a jury, however, attorney fees are not an issue for trial. *McClure*, 329 Ga. App. at 343 (1). Consequently, in such cases, the parties are not required to include the question of attorney fees in the pretrial order. Id. (plaintiff's failure to include the issue of attorney fees in the pretrial order did not bar a post-trial motion for fees under OCGA § 9-15-14, as "the court, not a jury," determines whether fees should be awarded under that statute).

In light of the foregoing, we vacate that portion of the trial court's order declining to award attorney fees and remand for a hearing on whether the Plaintiffs are entitled to recover attorney fees for their UDTPA claim, and, if so, the amount of such fees.

*Case No. A19A0549*

26

4. The Defendants assert that the trial court erred in awarding damages to Bearoff in her individual capacity for breach of the Non-Compete, because the violation of that agreement did not damage Bearoff individually. Instead, any damages resulting from Craton's breach of the Non-Compete (and Craton Entertainment's aiding and abetting of that breach) damaged Bearoff's business entities, JBear and JDream. As evidenced by the fact that the Defendants offer no legal authority to support this claim of error, their argument is without merit.[19]

First, we note that as a party to the Non-Compete, Bearoff was entitled to recover for breach of that contract even in the absence of evidence showing that she suffered actual damages. See *HA & W Capital Partners v. Bhandari*, 346 Ga. App. 598, 606-607 (2) (a) (816 SE2d 804) (2018) (a party to a contract who suffers no actual damages from the contract's breach nevertheless has a right to recover nominal

---

[19] The Defendants' failure to cite any legal authority in their opening brief to support this enumeration of error arguably means they have abandoned this claim. See *de Castro v. Durell*, 295 Ga. App. 194, 204 (3) (671 SE2d 244) (2008)(deeming an enumeration of error abandoned where the appellant failed to cite any legal authority in support thereof); Court of Appeals Rule25 ("[a]ny enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned). See also *Gresham v. Harris*, ___ Ga. App. ___, n.9 (825 SE2d 516) (2019) ("rhetoric is not a substitute for cogent legal analysis, which is, at a minimum, *a discussion of the appropriate law* as applied to the relevant facts") (citation and punctuation omitted; emphasis supplied). We nevertheless address this claim of error, noting that the Defendants did cite a single case in their reply brief.

damages); OCGA § 13-6-6. More importantly, the evidence establishes that the breach of the Non-Compete did damage Bearoff individually. The stated purpose of the Non-Compete was to help facilitate the payment of all amounts owed to Bearoff for her ownership interest in High Five and Shannon Video. After Craton defaulted on his obligations to Bearoff and discharged the debt in bankruptcy, Bearoff's only option to recoup her losses was to foreclose on the assets of High Five and Shannon Video and resume operating the business – albeit under a new name. After Bearoff did so, Craton (with the assistance of Craton Entertainment) then opened The Love Library in violation of the Non-Compete, thereby impeding Bearoff's ability to recover her personal losses. Accordingly, the trial court did not err in awarding nominal damages to Bearoff, individually, for breach of the Non-Compete.

5. The Defendants contend that the trial court erred in finding that they had converted social media accounts belonging to Shannon Video/Entice because: (a) the Plaintiffs failed to prove the necessary elements of that claim; and (b) the claim was barred under the doctrine of res judicata. We find no merit in either of these arguments.

(a) Under Georgia law, conversion is defined as

28

an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation. Any distinct act of dominion wrongfully asserted over another's property in denial of his right, or inconsistent with it, is a conversion.

*Qenkor Constr. v. Everett*, 333 Ga. App. 510, 519 (3) (773 SE2d 821) (2015) (citation and punctuation omitted). See also *All Bus. Corp. v. Choi*, 280 Ga. App. 618, 622 (2) (634 SE2d 400) (2006) ("[a]n exercise of dominion or control over secured property which is inconsistent with the rights of the secured party is conversion") (citation and punctuation omitted).

Here, the trial court viewed the Plaintiffs' claim as one for "traditional" conversion, which requires a plaintiff to show: "(1) title to the property or the right of possession[;] (2) actual possession in the other party[;] (3) demand for return of the property[;] and (4) refusal by the other party to return the property." *Capital Financial Svcs. Group v. Hummel*, 313 Ga. App. 278, 280-281 (721 SE2d 108) (2011) (citation and punctuation omitted). See also *Trotman*, 311 Ga. App. at 213 (4) (intangible materials developed by a company could be the subject of a conversion claim); *Taylor v. Powertel*, 250 Ga. App. 356, 358-359 (2) (551 SE2d 765) (2001)

29

("specific intangible property may be the subject [of] an action for conversion"). The Defendants contend that the Plaintiffs failed to prove the third and fourth elements of their traditional conversion claim – i.e., they failed to show that they demanded the return of the social media accounts to their control or that the Defendants refused that demand. This argument, however, fails to recognize that the social media accounts constituted collateral under the Security Agreement.

The Security Agreement gave the Plaintiffs a security interest in, inter alia, all of Shannon Video's intangible property. And the Defendants do not dispute that Shannon Video's trade name ("Entice") and the social media accounts it operated under that trade name constitute part of the company's intangible property and therefore constituted collateral under the Security Agreement. See OCGA § 11-9-102 (a) (43) (defining "general intangibles" that may be the subject of a security interest as "any personal property, . . . other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter of credit rights, letters of credit, money, and oil, gas, or other minerals before extraction"). The Plaintiffs foreclosed on the collateral covered by the Security Agreement and provided the Defendants with notice of that foreclosure. Instead of providing the Plaintiffs with the intangible property included in the collateral (i.e., the

30

social media accounts), however, the Defendants began to use those items to promote The Love Library. Thus, some evidence existed to support the trial court's finding that the Plaintiffs had demanded the return of the intangible property and that the Defendants had declined to relinquish control of that property. See *Lifestyle Home Rentals, LLC v. Rahman*, 290 Ga. App. 585, 585 (660 SE2d 409) (2008) (following a bench trial, a trial court's factual findings will not be disturbed if there is any evidence to support them).

Moreover, under Georgia law,

> a secured creditor has a right of action for conversion if property subject to its security interest is disposed of without the creditor's authorization. The elements of such a claim include the showing of a valid security interest in the debtor's property, disposition of that property, absence of the creditor's authorization for the disposition, and resulting damage to the creditor.

*All Bus. Corp.*, 280 Ga. App. at 622 (2) (citation and punctuation omitted). Here, the record shows that the Plaintiffs had a valid security interest in Shannon Video/Entice's social media accounts and, without the Plaintiffs' authorization, the Defendants disposed of those accounts by transferring them to The Love Library. The Plaintiffs suffered damage as a result of this conduct, because all of the social media

31

followers belonging to Shannon Video/Entice now belonged to the Defendants – the Plaintiffs' direct competitor. Additionally, the Defendants utilized those accounts to promote their business, to the detriment of the Plaintiffs. Given these facts, we find that the trial court did not err in concluding that Defendants converted the social media accounts belonging to the Plaintiffs.

(b) In Shannon Video's bankruptcy case, Bearoff filed a motion seeking relief from the automatic stay to allow her to secure the physical and cash collateral covered by the Security Agreement. Bearoff's motion also objected to any further orders allowing Craton to use any of Shannon Video's cash collateral. . On July 21, 2015, the Bankruptcy Court granted that motion and entered an order barring the Defendants from removing any collateral located in Entice Couples Boutique. The order also required Craton to provide Bearoff with physical access to the Entice Boutique; an accounting of any collateral removed from the store before certain, specified dates; an accounting for the use of all cash collateral between certain dates; an accounting of certain allowances or payments made on Entice's behalf; and all remaining cash collateral belonging to Shannon Video except for that in segregated tax accounts.

In early 2016, Bearoff brought a motion for contempt in the Bankruptcy Court, asserting that Craton had failed to comply with the July 2015 turnover order. The Bankruptcy Court granted that motion in part, and found Craton in contempt for using cash belonging to Shannon Video to purchase over $6,000 worth of inventory that he had delivered to a second adult store he owned and which was located in Athens. The court further found Craton in contempt for failing to turn over almost $7,000 in cash collateral.

At trial, the Defendants asserted that under the doctrine of res judicata, the Bankruptcy Court's contempt order barred the Plaintiffs' current claim for conversion. The trial court rejected this argument, and the Defendants challenge that ruling on appeal. We agree with the trial court.

"[T]he doctrine of res judicata forbids the litigation of a dispute that already has been litigated by the same parties and decided." *Bates v. Bates*, 317 Ga. App. 339, 342 (730 SE2d 482) (2012) (citation and punctuation omitted). Specifically, as codified at OCGA § 9-12-40, res judicata dictates that "[a] judgment of a court of competent jurisdiction shall be conclusive between the same parties and their privies as to all matters put in issue or which under the rules of law might have been put in issue in the cause wherein the judgment was rendered." For the doctrine to bar a

33

subsequent action, the party asserting that bar must prove that the causes of action were identical; the parties or their privies in both the current and former actions were the same; and the issue in question was actually adjudicated by a court of competent jurisdiction. *Body of Christ Overcoming the Church of God v. Brinson*, 287 Ga. 485, 486 (696 SE2d 667) (2010). Furthermore, the party asserting res judicata must show that "the party against whom the doctrine . . . is raised had a full and fair opportunity to litigate the issues in the first action." *Bates*, 317 Ga. App. at 342 (citation and punctuation omitted). See also OCGA § 9-12-42.

With respect to "identity of the cause of action," the Defendants argue that the contempt motion alleged conversion of collateral by Craton, and that Bearoff could have – but failed – to assert conversion of the intangible collateral. This argument misconstrues the scope of both the contempt proceeding and the Bankruptcy Court's order of contempt. The question in the contempt proceeding was not whether Craton had converted any property belonging to Shannon Video. Rather, the question was whether Craton had failed to comply with the Bankruptcy Court's July 2015 order to provide Bearoff with certain, specified items, including the cash collateral. And the Bankruptcy Court found that Craton had failed to turn over approximately $13,000 in collateral, and ordered him to pay that amount to Bearoff. Thus, despite the

34

Defendants' assertions to the contrary, Bearoff did not assert, and the Bankruptcy Court did not adjudicate, any claim of civil conversion. More importantly, given the limited scope of a contempt proceeding, Bearoff could not have asserted a claim for conversion of the intangible collateral in her motion for contempt. See *Jacob-Hopkins v. Jacob*, 304 Ga. App. 604, 606 (697 SE2d 284) (2010) ("when ruling on a motion for contempt, [a] court is limited to exercising that power necessary to enforce the terms of a previously[-]entered order, and lacks the authority to grant additional substantive relief"). Instead, she could only seek to hold Craton in contempt for failing to comply with the July 2015 turnover order. And that order did not address the intangible property given as security by Shannon Video.

In light of the foregoing, the Defendants failed to carry their burden of showing either that the bankruptcy proceeding involved claims for civil conversion, that the Bankruptcy Court adjudicated any conversion claim on the merits, or that Bearoff could have asserted such a claim in the contempt proceeding. The trial court, therefore, correctly found that res judicata did not bar the Plaintiffs' claim for conversion of Shannon Video/Entice's social media accounts.

6. As noted above, in dozens of social media posts advertising The Love Library, the Defendants used the Entice trade name. Additionally, when The Love

35

Library first opened, the Defendants placed a sign of bearing the Entice store logo in front of their store, next to their own sign. Based on this evidence, the trial court found that the Defendants had misappropriated a trade name (Entice) belonging to the Plaintiffs. The Defendants challenge this finding on appeal, relying on the fact that Bearoff never assumed ownership of Shannon Video and therefore was not entitled to ownership of Shannon Video's trade name. As again demonstrated by the Defendants' failure to cite a single legal authority to support this claim of error, their argument finds no support in the law.

A trade name constitutes a company's intangible property and can therefore be pledged as collateral and subject to a security interest. *Reis v. Ralls*, 250 Ga. 721, 723 (1) (301 SE2d 40) (1983). Thus, under the terms of the Security Agreement, when the Plaintiffs foreclosed on Shannon Video's collateral, they obtained ownership of the Entice trade name. The fact that the Plaintiffs chose not to take possession of Shannon Video's debt-saddled corporate entity did not affect the Plaintiffs' rights under the Security Agreement. Id. Accordingly, the evidence showing that, even after the Plaintiffs obtained ownership of the Entice trade name, the Defendants continued to use the Entice name to advertise their own business supported the trial court's finding that the Defendants misappropriated that name. See *Hummel*, 313 Ga. App.

36

at 280 (defining conversion as including the misappropriation of another's property). See also *Bullard v. MRA Holding, LLC*, 292 Ga. 748, 752 (2) (740 SE2d 622) (2013) (defining misappropriation, in the context of a right to privacy claim, as an "appropriation, for the defendant's benefit, use[,] or advantage, of the plaintiff's name") (citation and punctuation omitted).

7. In their final enumeration of error, the Defendants challenge the trial court's award of $50,000 in punitive damages, arguing that the amount was disproportionate to the other damages awarded.[20] To support this claim of error, the defendants rely on the three-part test articulated by the United States Supreme Court for determining whether an award of damages is so excessive as to violate the due process clause of the Fourteenth Amendment. See *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U. S. 408, 416-418 (II) (123 SCt 1513, 155 LEd2d 585) (2003). In their enumeration of error, however, the Defendants assert only that the award must be reversed because it was 25 times greater than the nominal damages awarded. Thus, because the Defendants do not assert that the punitive damages award violated their

---

[20] The Defendants further contend that the trial court should have heard evidence of Craton's financial circumstances before making an award of punitive damages. The Defendants, however, offered no citation of legal authority or reasoned legal argument to support this statement. Accordingly, we deem this argument abandoned pursuant to Court of Appeals Rule 25 (c).

constitutional rights, we are not required to analyze the award using the test articulated in *State Farm*. See *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U. S. 424, 433 (II) (121 SCt 1678, 149 LE2d 674) (2001); *Middlebrooks v. Hillcrest Foods*, 256 F3d 1241, 1249 (IV) & n.5 (11th Cir. 2001)*Time Warner Entertainment Co. v. Six Flags Over Georgia*, 254 Ga. App. 598, 603 (2) (b) (563 SE2d 178) (2002). Instead, we review the award for an abuse of discretion, applying Georgia's law of punitive damages. *Georgia Clinic, P. C. v. Stout*, 323 Ga. App. 487, 494 (4) (747 SE2d 83) (2013); *Time Warner*, 254 Ga. App. at 603 (2) (b). See also *Leatherman*, 532 U. S. at 433.

Under the abuse of discretion standard, a reviewing court lacks "'the broad discretionary powers vested in trial courts to set aside verdicts.'" *Time Warner*, 254 Ga. App. at 602 (2) (a) (ii), quoting *Smith v. Miliken*, 247 Ga. 369, 372 (3) (276 SE2d 35) (1981). Moreover, given that the finder-of-fact had the opportunity to judge the credibility of the witnesses, "this [C]ourt is without power" to set aside a verdict as excessive "unless it is clear from the record that the verdict . . . was prejudiced or biased or was procured by corrupt means." Id. (citation and punctuation omitted). See also *Moody v. Dykes*, 269 Ga. 217, 221-222 (6) (496 SE2d 907) (1998) (an excessive or inadequate verdict constitutes a mistake of fact rather than an error of law); *Reheis*

38

*v. Baxley Creosoting & Osmose Wood Preserving Co.*, 268 Ga. App. 256, 262 (2) (601 SE2d 781) (2004) ("under Georgia common law, the measure of punitive damages to be awarded, if any, is determined according to the enlightened conscience of an impartial [fact-finder]").

Georgia law recognizes that the purpose of punitive damages is not to compensate the plaintiff, but instead is "solely to punish, penalize, or deter" certain tortious conduct. OCGA § 51-12-5.1 (c). Thus, because the purpose of punitive damages "is based on factors other than the actual harm caused," our Supreme Court has unequivocally "rejected the notion that punitive damages must necessarily bear some relationship to the actual damages awarded[.]" *Hospital Auth. of Gwinnett County v. Jones*, 261 Ga. 613, 614 (1) (409 SE2d 501) (1991). Moreover, although the Georgia Supreme Court has recognized that examining the ratio between compensatory and punitive damages may be appropriate in some cases, such a comparison is not necessarily helpful in cases involving minimal compensatory or nominal damages. Id. at 615 (1). Specifically, the court observed that in such cases,

limiting punitive damages based on the actual damages awarded could interfere with

the deterrent and punitive purposes of punitive damages.[21] Id.

---

[21] Our Supreme Court's recognition of this fact is in accord with that of both the United States Supreme Court and at least six of the federal circuits. In *State Farm*, the United States Supreme Court indicated that ratios greater than a single digit of compensatory damages to punitive damages will not necessarily violate due process when reprehensible conduct results "'in only a small amount of economic damages.'" 538 U. S. at 425 (III) (B), quoting *BMW of North America v. Gore*, 517 U. S. 559, 582 (III) (116 SCt 1589, 134 LE2d 809) (1996). Thus, a number of federal appellate courts have recognized that in cases where a plaintiff receives only a small amount of compensatory damages or nominal damages, a punitive damages award may exceed the single digit ratio without violating due process. As the Eleventh Circuit noted, limiting the punitive damages to a single digit ratio in such cases "would utterly fail to serve the traditional purposes underlying an award of punitive damages, which are to punish and deter." *Kemp v. Am. Telephone & Telegraph Co.*, 393 F3d 1354, 1364-1365 (II) (B) (2) (11th Cir. 2004). See also *Arizona v. ASARCO LLC*, 773 F3d 1050, 1058 (II) (B) (9th Cir. 2014) ("[b]ecause nominal damages measure neither damage nor severity of conduct, it is not appropriate to examine the ratio of a nominal damages award to a punitive damages award"); *Saunders v. Branch Banking and Trust Co. of Va.*, 526 F3d 142, 153-154 (III) (B) (4th Cir. 2008) (declining to apply a ratio analysis in a case where only nominal damages were awarded, and approving an award of $1000 in nominal damages and $80,000 in punitive damages); *Romanski v. Detroit Entertainment, LLC*, 428 F3d 629, 645-646 (II) (C) (2) (6th Cir. 2005) (declining to apply a ratio analysis in a case resulting in low economic damages; "in cases where the compensatory award is very low or nominal, any appreciable exemplary award would produce a ratio that would appear excessive by this measure") (citation and punctuation omitted); *Williams v. Kaufman County*, 352 F3d 994, 1016, n. 76 (5th Cir. 2003) ("any punitive damages-to-compensatory damages 'ratio analysis' cannot be applied effectively in cases where only nominal damages have been awarded"); *Local Union No. 38, Sheet Metal Workers Intl. Assn., AFL-CIO v. Pelella*, 350 F3d 73, 88-89 (IV) (C) (2d Cir. 2003) ("the use of a multiplier [does] not serve as the best available tool for the assessment of punitive damages where the compensatory damages were nominal").

Thus, in a case such as this, where only nominal damages were awarded, we determine whether the punitive damages award was excessive by first asking whether there is any "direct proof of prejudice or bias" by the finder of fact.[22] *Time Warner*, 254 Ga. App. at 604 (2) (b). In the absence of anything indicating that the punitive damages award was infected by bias or prejudice, we consider the amount of the award in light of the evidence presented at trial. Id. For an award to be considered excessive, "'the amount thereof, when considered in connection with all the facts, must shock the moral sense, appear exorbitant, flagrantly outrageous, and extravagant. It must carry its death warrant upon its face.'" Id., quoting *Western & Atlantic R. v. Burnett*, 79 Ga. App. 530, 542-543 (7) (54 SE2d 357) (1949). Put another way, "appellate courts look to see whether the award shocks the judicial conscience." Id. (citation and punctuation omitted).

Here, the evidence showed that Craton made a deliberate decision to quit making any kind of payments due under the Promissory Note in December 2013, and

_____

[22] Such evidence could include the improper introduction of inflammatory evidence, inappropriate or inflammatory remarks or argument by counsel, or inappropriate or prejudicial statements made by the trial court. And in cases where significant compensatory damages were awarded, "an appellate court may look to the ratio of compensatory to punitive damages for some evidence that the punitive damages award is infected by bias or prejudice." *Time Warner*, 254 Ga. App. at 604 (2) (b).

41

instead simply asked Bearoff to forgive the debt. He also admitted that using Craton Entertainment to open another adult store became the "backup plan" in the event Bearoff refused to forgive the debt. Thus, after Bearoff insisted on repayment, and in an apparent effort to avoid Shannon Video's obligations, Craton filed for bankruptcy for Shannon Video. Then, in violation of the order of the Bankruptcy Court, and after Shannon Video closed, Craton used Shannon Video's cash collateral to purchase inventory for another store he owned. He also converted approximately $6,000 of the cash collateral to his own use. Moreover, despite Craton's insistence to Bearoff that Shannon Video was not a viable business capable of making a profit and repaying its debts, the record shows that Craton clearly believed there was a relatively lucrative market for an adult store in Rome.

The evidence further showed that the Defendants opened and operated The Love Library despite knowing that this conduct violated the Non-Compete. And Craton's testimony indicated that this violation of the Non-Compete was both knowing and deliberate, with Craton explaining that, "as far as I was concerned, the Non-Compete agreement was over when the store closed and [Bearoff] got everything." Furthermore, after being served with a cease-and-desist letter warning Craton that opening The Love Library would be a violation of the Non-Compete,

Craton responded with what could be considered an effort to harass and intimidate Bearoff. Specifically, Craton sent Bearoff a cease-and-desist letter asserting that her operation of The Frisky Biscuit constituted a violation of the Non-Compete. He then, acting through High Five, initiated a lawsuit against the Plaintiffs alleging both trespass on the Property and a violation of the Non-Compete. Finally, instead of turning over the intangible collateral Plaintiffs were entitled to under the Security Agreement, the Defendants retained control of the social media accounts and used them to promote their new business venture, which was in direct competition with the Plaintiffs. The Defendants also used the Entice trade name in an effort to lure Shannon Video/Entice's customers to The Love Library. Finally, although the trade name "Entice Couple's Boutique" belonged to Shannon Video, the Defendants attempted to trademark the name, claiming that it was owned by Craton Entertainment.

In light of this evidence, we find no abuse of discretion by the trial court in awarding the Plaintiffs $50,000 in punitive damages. See *Lawrence v. Direct Mtg. Lenders Corp.*, 254 Ga. App. 672, 675-676 (3) (563 SE2d 533) (2002) (given the evidence of the defendant's misconduct, the trial court did not abuse its discretion in

awarding $50,000 in punitive damages in conjunction with an award of $1,500 in compensatory damages).

For the reasons set forth above, in Case No. A19A0548, we affirm the trial court's grant of summary judgment in favor of the Defendants on the Plaintiffs' claim for an equitable extension of the non-compete. We also vacate that part of the order of judgment declining to award attorney fees, and remand for further proceedings on the question of whether the Plaintiffs are entitled to recover the attorney fees associated with their claim under the UDTPA. In Case No. A19A0549, we affirm the the order of judgment against Charles Craton and Craton Entertainment.

*Judgment affirmed in part and vacated in part. Case remanded with direction. Dillard, C. J., and Hodges, J., concur.*