**FIFTH DIVISION**
**MERCIER, C. J.,**
**MCFADDEN, P. J., and RICKMAN, P. J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 11, 2025**

# In the Court of Appeals of Georgia

A24A1281, A24A1282. STERLING PLANET, INC. v. GRP HOLDCO, LLC et al; and vice versa.

RICKMAN, Presiding Judge.

In this business dispute involving renewable energy certificates, Sterling Planet, Inc. appeals the Georgia State-wide Business Court's Order on Pending Motions and, in Case Number A24A1281, contends that the business court erred in striking certain portions of an affidavit submitted in support of Sterling's motion for partial summary judgment, granting GRP Holdco, LLC, GRP Madison, LLC, and GRP Franklin, LLC's (collectively, "GRP") motion for summary judgment on Sterling's promissory estoppel claim, and denying Sterling's motion for summary judgment on GRP's conversion claim. GRP cross-appeals the same order and, in Case No. A24A1282, contends that the business court erred in denying its motion for partial summary

judgment on its conversion claim and in denying its motion for sanctions pursuant to OCGA § 9-15-14. For the reasons that follow, we affirm in both cases.

"On appeal from the grant or denial of summary judgment, we conduct a de novo review, with all reasonable inferences construed in the light most favorable to the nonmoving party." (Citation and punctuation omitted.) *Phillips v. Adams, Jordan & Herrington, P.C.*, 350 Ga. App. 184, 184 (828 SE2d 414) (2019). "On cross-motions for summary judgment, each party must show there is no genuine issue of material fact and that each, respectively, is entitled to summary judgment as a matter of law; either party, to prevail by summary judgment, must bear its burden of proof." (Citation and punctuation omitted.) *White v. Gens*, 348 Ga. App. 145, 146 (1) (820 SE2d 254) (2018).

At the outset, we note that renewable electricity generation can be split into two parts: the electricity produced by a renewable generator and the renewable or environmental "attributes" of that generation. See Katrina M. Wyman & Adalene Minelli, *Propertizing Environmental Attributes*, 39 Yale J. on Reg. 1391, 1397 (2022) (defining environmental attributes). The environmental attributes can be unbundled

from the energy itself and sold separately as renewable energy certificates (RECs). See id. at 1396.

Here, the record shows that GRP Holdco indirectly owns two renewable energy power plants located in Georgia: GRP Franklin Renewable Energy Facility, which is operated by GRP Franklin, LLC; and GRP Madison Renewable Energy Facility, which is operated by GRP Madison, LLC.[1] The GRP Franklin and GRP Madison facilities supply electricity to the power grid for residential and commercial consumption. Because the biomass that powers the GRP facilities' steam turbines is considered a renewable resource, the facilities qualify for RECs, which are issued based on the amount of power generated. Each REC at issue here represents the environmental attributes associated with the generation of one megawatt hour ("MWh") of renewable energy.

Sterling is a self-described marketer of environmental attributes. In May 2021, Sterling CEO and chairman Therrell "Sonny" Murphy, Jr. reached out to GRP seeking to discuss GRP's RECs and Sterling's ability to "create some real value for GRP." In two transactions in August 2021, Sterling purchased RECs from GRP for

---

[1] GRP Holdco is the managing member of GRP Franklin, LLC and GRP Madison, LLC.

$1.00 per REC. Both sales were documented by written Renewable Energy Certificate Purchase Agreements that were signed by both parties.

In July and August 2021, Sterling and GRP discussed the possibility of increasing the market value of GRP's RECs by obtaining Green-e certification for the RECs from the Center for Resource Solutions.[2] Sterling informed GRP that it needed to execute documents naming Sterling as the "Responsible Party" on the North American Renewables ("NAR") Registry[3] before Sterling could begin the Green-e certification process. In November 2022, GRP executed the necessary documents, which gave Sterling the "full and sole management and authority over the transactions and activities related to the Asset within NAR."[4] In practice, that meant that the GRP facilities were registered with NAR, that the RECs attributable to the renewable energy generated by the facilities would go into Sterling's NAR account as the

---

[2] The Center for Resource Solutions determines Green-e eligibility and issues Green-e certification of RECs.

[3] The NAR Registry is an electronic tracking system, managed by APX, Inc., that facilitates the sale and transfer of RECs. Each REC has a unique serial number attached to it.

[4] The NAR Registry defines an Asset as "either a renewable energy generator, a contract with a renewable energy generator, or an Aggregated Project registered by an Account Holder in the Registry." Here, the Assets were the GRP facilities.

designated Responsible Party, and Sterling would manage the RECs on the NAR Registry on GRP's behalf.

In February 2022, the newly installed President and CEO of GRP Holdco, Charles Abbott, reached out to Sterling to discuss the GRP facilities. Sonny Murphy responded on Sterling's behalf, indicated that he wanted to discuss Sterling's relationship with GRP, and forwarded an unsigned 2015 "Renewable Energy Certificate Marketing Agreement" between Sterling and Green Fuels Energy, LLC, which Murphy claimed "was negotiated with the purchase of the plant."[5] The 2015 agreement contemplated that Sterling would market "Project RECs" for a term of six years but contained no contract price for the sale of the RECs. Minutes later, Murphy sent Abbott what he referred to as "a template of the agreement to be used in year 8 of my negotiations," which was an unsigned 2022 "Renewable Energy Certificate Marketing Agreement" between Sterling and an unnamed "Generator" with an REC contract price provision that would allow Sterling to retain a 20 percent fee for RECs purchased from the generator by Sterling's customers. After reviewing Sterling's

---

[5] In 2014, a Sterling-owned entity sold to a GRP-owned entity a plant that subsequently became GRP Franklin. In this litigation, Murphy has taken the position that part of the compensation to Sterling for the sale was that Sterling would serve as the REC marketer for the GRP facilities.

proposed 20 percent marketing fee, Abbott responded that GRP would be willing to pay a fixed fee of $150,000, plus a 4 percent brokerage fee for REC sales made by Sterling. Murphy rejected that offer.[6]

On July 21, 2022, Abbott contacted the NAR Registry and requested the recission of Sterling's Responsible Party designation for the GRP facilities on the registry. That same day, Charles Li, the senior administrator of APX and the manager of the NAR Registry, contacted Sterling's vice president of client services, Valerie Johnson, and notified her of Abbott's request that the GRP facilities and all RECs associated with the facilities be transferred to GRP's account. Li attached a list of the RECs to the July 21 email, on which Abbott was copied, and asked Johnson, "Can you confirm?" That same day, Johnson responded, "No, I cannot confirm at this time. Some of the RECs are already committed to customers and have not yet been transferred or retired." Minutes later, Abbott requested that Johnson "[p]lease provide a reconciliation of those RECs that you believe cannot be transferred because they are 'committed'."

_____

[6] Despite GRP's February 2022 rejection of Sterling's proposed 20 percent fee for REC sales, in April 2022, Sterling deducted 20 percent from the amount it paid GRP for the sale of GRP RECs.

On August 2, 2022, Abbott requested an update on the REC reconciliation from Johnson, who responded that she would have it by the end of the week. On August 9, Abbott again emailed Johnson, "It has now been more than two weeks since our request for a simple reconciliation of the 'committed' RECs. Please provide today." Johnson responded to Abbott the following day that she had "been advised that any further communications related to the GRP projects need to go through our attorneys. The information you are requesting will be sent to them shortly. Thank you all for understanding while both parties sort out any contractual disputes."

On August 23, 2022, Sterling, through counsel, sent GRP a table showing the number of active, retired, and transferred RECs. GRP responded through counsel that the information provided was not sufficient and requested specific additional information about the REC transactions. Sterling never responded directly to this request. Sterling did, however, continue to sell GRP RECs during this time period, with sales occurring on four different dates in August 2022 (the "August REC Sales").

On September 8, 2022, GRP sent Sterling a proposed letter addressed to Li at the NAR Registry pursuant to which the parties would jointly request the transfer of

7

GRP's facilities and associated RECs remaining in Sterling's account to GRP Holdco. After receiving no response, on September 16, 2022, GRP made another request to Sterling to transfer the GRP facilities and RECs and stated that if no response was received by September 21, GRP would "assume that Sterling Planet will not agree to cooperate in the transfer of the RECs and GRP will pursue its legal recourses for appropriate injunctive relief and damages." Sterling responded by sending GRP a draft temporary forebearance agreement dated September 22, 2022, pursuant to which Sterling would "continue to market GRP . . . RECs" through its NAR account under GRP's direction for a fee of $.19 per REC sold. GRP did not sign the proposed agreement.

GRP commenced litigation on October 31, 2022, by filing a verified complaint for declaratory judgment, injunctive relief, and damages as well as an emergency motion for an interlocutory injunction in which it sought to require Sterling to transfer control of the GRP facilities and RECs on the NAR Registry to GRP. Ten days later, Sterling contacted the NAR Registry about the necessary steps for Sterling to transfer the assets and remaining RECs to GRP's NAR account. And on November 18, 2022,

GRP's RECs were transferred to an account that GRP had recently established (the "Returned RECs"). GRP subsequently withdrew its emergency motion.

In its verified complaint, GRP asserted, inter alia, claims against Sterling for conversion, money had and received, intentional interference with business relations, and intentional interference with property rights. In a verified answer and counterclaim, which was amended three times, Sterling asserted claims against GRP for breach of contract or, in the alternative, "promissory estoppel/quantum meruit/unjust enrichment," and sought specific performance of the "valid and enforceable written agreement" that would require GRP to upload to Sterling's NAR account "all RECs created by both plants from February 1, 2022," as well as attorney fees and expenses pursuant to OCGA § 13-6-11.

GRP moved to dismiss Sterling's counterclaims and, following a hearing, the business court dismissed Sterling's claims for breach of contract and specific performance. The business court denied GRP's motion to dismiss Sterling's claims for promissory estoppel, quantum meruit, and unjust enrichment as well as its claim for litigation expenses pursuant to OCGA § 13-6-11.

Following discovery, GRP and Sterling both filed motions for partial summary judgment. GRP moved for summary judgment as to liability on its claims for conversion and intentional interference with business relations and sought summary judgment on Sterling's claims for promissory estoppel and OCGA § 13-6-11 litigation expenses. GRP also sought attorney fees and expenses under OCGA § 9-15-14 based on Sterling's pursuit of its breach of contract claim. Sterling moved for summary judgment as to liability on its claims for promissory estoppel, quantum meruit, and unjust enrichment and sought summary judgment on GRP's claims for conversion, money had and received, intentional interference with business relations, and intentional interference with property rights. GRP then moved to strike the affidavit of Sonny Murphy, which was submitted in support of Sterling's summary judgment motion.

Following a hearing, the business court granted in part GRP's motion to strike the Sonny Murphy affidavit and, as a result, declined to consider those portions of the affidavit that the court found to be irrelevant, unsupported conclusions of law, or conclusory statements not supported by fact or circumstances. The business court then granted summary judgment to GRP on Sterling's promissory estoppel claim,

granted summary judgment to Sterling on GRP's claim for intentional interference with business relations, and denied the remainder of GRP's and Sterling's summary judgment motions. These appeals followed.

*Case No. A24A1281*

1. Sterling contends that the business court erred by disregarding portions of the Murphy affidavit that was submitted in support of its summary judgment motion.

Affidavits submitted in support of or opposition to summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in the evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." OCGA § 9-11-56 (e). To the extent that such an affidavit contains "hearsay, unsupported conclusions, and other inadmissible material," the trial court should strike or refrain from considering those portions. *Baxley v. Baldwin*, 279 Ga. App. 480, 481 (1) (631 SE2d 506) (2006). "Whether a specific averment of an affidavit is admissible and, therefore, ought to be considered on summary judgment is committed, like other evidentiary questions, to the discretion of the trial court, and we review a decision to strike an affidavit only for an abuse of that discretion." *Whitlock v. Moore*, 312 Ga. App. 777, 779 (1) (720 SE2d 194) (2011).

Here, Sterling challenges the trial court's exclusion of language in paragraphs 6, 7, and 29 of the Murphy affidavit in which Murphy stated that Sterling entered into a contract with GRP to be the exclusive marketer of RECs produced by GRP. The business court did not abuse its discretion in refusing to consider those portions of the Murphy affidavit on the ground that they were not relevant for purposes of resolving the summary judgment motions as the business court had previously dismissed Sterling's breach of contract claims. See *Cox v. U.S. Markets*, 278 Ga. App. 287, 290 (3) (628 SE2d 701) (2006) (irrelevant matter contained within affidavits in support of or in opposition to motions for summary judgment should be excluded).

Sterling also argues that the business court should not have disregarded other portions of the Murphy affidavit because they were "made on the basis of personal knowledge, not speculation." But this argument presents nothing for our review. The business court did not strike any portions of the affidavit because they were not based on personal knowledge, and Sterling fails to address the actual basis for the business court's actions with respect to those paragraphs – that they constituted conclusory statements lacking substantiating facts or unsupported conclusions of law – both of which are valid bases for disregarding statements within an affidavit. See *Whitcomb v.*

12

*Bank of America, N.A.*, 365 Ga. App. 795, 804 (5) (c) (880 SE2d 310) (2022) ("In the absence of substantiating facts, a self-serving and conclusory affidavit is insufficient to create an issue for trial."); *Crouch v. Bent Tree Community*, 310 Ga. App. 319, 322 (3) (713 SE2d 402) (2011) (Affidavits that contain "mere legal conclusions and allegations present no issues of fact on a motion for summary judgment," and "such legal conclusions are to be disregarded in considering the affidavit in connection with the motion for summary judgment.") (citations and punctuation omitted).

2. Sterling contends that the business court erred by granting GRP's motion for summary judgment on Sterling's promissory estoppel claim.

Sterling's promissory estoppel claim requires proof that

(1) [GRP] made a promise or promises; (2) [GRP] should have reasonably expected [Sterling] to rely on such promise; (3) [Sterling] relied on such promise to [its] detriment; and (4) an injustice can only be avoided by the enforcement of the promise, because as a result of the reliance, [Sterling] changed [its] position to [its] detriment by surrendering, forgoing, or rendering a valuable right.

(Citation and punctuation omitted.) *Woodstone Townhouses v. Southern Fiber Worx*, 358 Ga. App. 516, 530 (4) (855 SE2d 719) (2021); see OCGA § 13-3-44 (a) ("A promise which the promisor should reasonably expect to induce action or forbearance on the

part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.").

"Although a promise need not meet the formal requirement of a contract to support a claim for promissory estoppel, it must have been communicated with sufficient particularity to be enforced." *Woodstone Townhouses*, 358 Ga. App. at 531 (4) (a). "Promissory estoppel cannot be based upon vague, indefinite promises." Id.

Sterling contends that its promissory estoppel claim is supported by allegations in its verified amended counterclaim in which it alleged that GRP promised that all RECs produced by the GRP facilities would be uploaded to Sterling's NAR account on a monthly basis for resale, that this arrangement would last for a period of six years, and that Sterling would be paid twenty percent of the net sales price for the REC sales. As a counterclaim defendant, GRP need not affirmatively disprove Sterling's claim; "instead, the burden on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case." *Lau's Corp. v. Haskins*, 261 Ga. 491, 491 (405 SE2d 474) (1991). If GRP discharges this burden,

14

Sterling "cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue." Id.

In its motion for summary judgment, GRP challenged the promissory estoppel claim on the grounds that there was no evidence that GRP made the promises alleged by Sterling, that the promises alleged were vague and uncertain, and that Sterling's reliance on any such promise was not reasonable. GRP pointed to deposition testimony from David Shaffer, former president of a GRP-related entity, who recanted portions of an affidavit Murphy created for him that was relied upon to support Sterling's second amended answer and counterclaim. Shaffer testified that during his tenure as president, from 2015 to 2019, he never discussed any specific terms of a deal for Sterling to market GRP's RECs, such as dates, methodology, or economics, and that a split of the proceeds from the sale of RECs was never discussed. GRP also pointed out that Carey Davis, executive vice president of GRP Madison and GRP Franklin from January 2018 to January 2022, had discussions with Sterling regarding the transaction of RECs beginning in 2021. Davis deposed that he communicated with Johnson at Sterling regarding the GRP RECs, and that no one at Sterling ever communicated to him that Sterling intended to take a twenty percent fee on the sale

15

of GRP RECs. GRP further pointed to evidence that, in February 2022, Abbott rejected Sterling's proposed 20 percent marketing fee.

Sterling did not respond to GRP's arguments or substantively address the promissory estoppel claim in its own summary judgment motion. The business court nonetheless addressed the claim on the merits and concluded that summary judgment was appropriate, inter alia, because promissory estoppel does not apply to vague or indefinite promises.

"The existence of an enforceable promise is the 'threshold requirement' for a claim of promissory estoppel[.]" *Underwood v. Colony Bank*, 362 Ga. App. 548, 556 (2) (869 SE2d 535) (2022). Here, there is no evidence that the unnamed person who made the alleged promise to Sterling had authority to bind GRP or evidence as to when the agreement with Sterling would commence. Because promissory estoppel does not apply to vague or indefinite promises, the trial court did not err in granting summary judgment to GRP on Sterling's promissory estoppel claim. See *Underwood*, 362 Ga. App. at 556 (2) ("promises that are vague, indefinite, or of uncertain duration are not enforceable"); *Ga. Investments Intl. v. Branch Banking & Trust Co.*, 305 Ga. App. 673, 676 (1) (700 SE2d 662) (2010) (promise that was vague and indefinite as to

16

material terms was unenforceable); see also *Woodstone Townhouses*, 358 Ga. App. at 531 (4) (a) ("an 'implied understanding' is not sufficient to support a promissory estoppel claim").

3. Sterling contends that the business court erred in denying its motion for summary judgment on GRP's conversion claim.[7]

"A conversion results when, without authority, a party exercises the right of ownership over, assumes dominion over, or appropriates personal property belonging to another party, in hostility of that other party's rights." *Rubenstein v. Palatchi*, 359 Ga. App. 139, 142 (1) (857 SE2d 81) (2021). In order to establish a conversion claim, "a plaintiff must demonstrate that (1) [it] owns title to or has the right to possess the personal property at issue; (2) the defendant actually possesses the property; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return it." Id.; see OCGA § 51-10-1.

---

[7] GRP also asserted a claim for "intentional interference with property rights," but the business court did not address that claim separately and instead considered it and the conversion claim under a conversion analysis. Neither party has objected to that aspect of the business court's opinion. As a result, we do not consider that alleged claim separately.

Here, Sterling sought summary judgment on GRP's conversion claim in part based on its assertion that GRP could not establish an ownership interest in the RECs at issue at any pertinent time because it merely owned the right to transfer environmental attributes stemming from the production of renewable energy. The business court rejected that assertion and further concluded that, however labeled, "the environmental attributes associated with each MWh of renewable energy generated by the GRP Plants that were uploaded to the NAR Registry" are properly considered "property" for purposes of a conversion claim. On appeal, Sterling challenges that conclusion, taking the position that the "matter of 'ownership' of the RECs at issue should be determined by reference to the parties' agreement," not the courts, and that the trial court erred in determining that RECs are "property" subject to a conversion claim.[8]

As recognized by the business court, "[t]angible personalty or specific intangible property may be the subject for an action for conversion[.]" *Taylor v. Powertel*, 250 Ga. App. 356, 358-359 (2) (551 SE2d 765) (2001). Although Georgia

---

[8] As pointed out by the business court, the only written agreements between the parties expressly stated that "[t]itle to and ownership of RECs purchased under this Agreement shall pass from [GRP] to Sterling Planet" on the specified delivery date.

courts do not appear to have addressed whether RECs could be considered "specific intangible property" subject to a conversion claim, this Court has upheld a trial court's conclusion that social media accounts had been converted, see *Bearoff v. Craton*, 350 Ga. App. 826, 840-841 (5) (a) (830 SE2d 362) (2019), and upheld a jury verdict on a conversion claim involving intangible teaching materials on a laptop, see *Trotman v. Velociteach Project Mgmt.*, 311 Ga. App. 208, 213 (4) (715 SE2d 449) (2011). In addition, federal district courts in Georgia have concluded that "bitcoins are sufficiently identifiable to be considered 'specific intangible property' subject to an action for conversion," *BDI Capital v. Bulbul Investments*, 446 FSupp.3d 1127, 1137 (III) (B) (N.D. Ga. 2020), and found a substantial likelihood of success on the merits of a claim involving the conversion of social media accounts and login information, *MasterMind Involvement Mktg. v. Art Institute of Atlanta*, 389 FSupp.3d 1291, 1294 (7) (N.D. Ga. 2019). Given the circumstances under which Georgia courts have found intangible property to be subject to a conversion claim, we conclude that the RECs at issue here can be considered a species of "specific intangible property" for purposes of a conversion claim.[9]

[9] We recognize that RECs have been more broadly recognized as property in other publications. See, e. g., U. S. Environmental Protection Agency, State Solar

4. GRP contends that the business court erred in denying its motion for partial summary judgment as to liability on the fourth element of its conversion claim, refusal.

In addressing the refusal issue, the business court concluded that issues of fact remained as to whether Sterling *could* transfer control of GRP's facilities and RECs to GRP because GRP had not established an account at the NAR Registry, which precluded summary judgment as to liability on GRP's conversion claim with respect to the August REC Sales and the Returned RECs. GRP challenges this conclusion and argues that nothing in the record shows that Sterling's failure to transfer the RECs was based on anything other than its refusal to do so. In fact, Sterling submitted an affidavit from Johnson, who averred that Sterling could not transfer the GRP facilities

---

Renewable Energy Certificate Markets, https://www.epa.gov/greenpower/state-solar-renewable-energy-certificate-markets ("A renewable energy certificate (REC) is a market-based instrument that represents the property rights to the environmental, social, and other non-power attributes of renewable electricity generation."); Wyman & Minelli, *Propertizing Environmental Attributes*, 39 Yale J. on Reg. at 1400 ("The fact that environmental attributes have value and can be bought and sold separately from the object or activity generating them [packaged as RECs for example], combined with the fact that they can retain that value regardless of the entity possessing them, all point to environmental attributes as proper objects of property."). Our conclusion, however, is limited to the specific RECs at issue in this litigation in the context of GRP's conversion claim.

or RECs until GRP established its own account with the NAR Registry and that Sterling initiated the transfers the same day that it received notice that GRP had created its account. Thus, there is an issue of fact as to whether Sterling could have returned the RECs earlier than it did, and GRP was not entitled to summary judgment on its conversion claim.[10] See generally *Mitzner v. Hyman*, 175 Ga. App. 311, 312-313 (1) (333 SE2d 182) (1985) (plaintiff not entitled to summary judgment on conversion claim were there was evidence that defendants became unable to return the property to plaintiff).

5. GRP contends that the business court erred in denying its claim for sanctions under OCGA § 9-15-14 (a), which was based on Sterling's pursuit of its breach of contract claim.

A party is entitled to reasonable and necessary attorney fees and expenses of litigation under OCGA § 9-15-14 (a) when another party "has asserted a claim, defense, or other position with respect to which there existed such a complete absence

---

[10] Given this conclusion, we need not address GRP's contention that the business court erred in denying its motion for partial summary judgment as to liability on the third element of its conversion claim, demand, when it determined that genuine issues of material fact remained as to whether GRP made a demand for the return of its RECs on July 21, 2022.

of any justiciable issue of law or fact that it could not be reasonably believed that a court would accept the asserted claim, defense, or other position." "The damages authorized by § 9-15-14 are intended not merely to punish or deter litigation abuses but also to recompense litigants who are forced to expend their resources in contending with abusive litigation." (Citation and punctuation omitted.) *Riddell v. Riddell*, 293 Ga. 249, 250 (744 SE2d 793) (2013). We will affirm a trial court's ruling on a claim for attorney fees under OCGA § 9-15-14 (a) if there is any evidence to support it. See *Citizens & Southern Trust Co. v. Trust Co. Bank*, 262 Ga. 345, 345 (417 SE2d 148) (1992); *Calvert v. Calvert*, 373 Ga. App. 689, 696 (3) (908 SE2d 332) (2024).

Here, Sterling alleged in its breach of contract claim that it had a "valid and enforceable" agreement with GRP "[a]t all times herein." Sterling cited to three agreements, which it attached as Exhibit C, in support of its claim of a written exclusive marketing agreement with GRP for its RECs.[11] In its order dismissing Sterling's breach of contract claim, the business court held that the first two

---

[11] The Exhibit C agreements included two unsigned 2015 "Renewable Energy Certificate Marketing Agreements" between Sterling and Green Fuels Energy, LLC and a third 2015 REC marketing agreement between Sterling and GRP Franklin, LLC that contained no contract price but was signed on behalf of GRP Franklin.

agreements were not enforceable because GRP was not a party to either agreement, both of which were subject to the Statute of Frauds, and the third agreement expired before any alleged breaches by GRP Franklin.

In its motion for fees and expenses under OCGA § 9-15-14 (a), GRP argued that Sterling had asserted a breach of contract claim "premised on factually inaccurate pleadings and affidavits" and opposed the dismissal of the breach of contract claims by asserting positions with respect to which there existed a complete absence of any justiciable issue of law or fact. The business court concluded that although ultimately unsuccessful, Sterling's arguments in support of its breach of contract claim did not warrant sanctions under OCGA § 9-15-14.

On appeal, GRP contends that the business court failed to recognize that *each* claim, defense, or position asserted by a party may independently be subject to sanctions. GRP argues that fees and expenses under OCGA § 9-15-14 (a) were appropriate based on (1) Sterling's claim that the agreements attached as Exhibit C to its answer and counterclaims, as amended, were binding even though Murphy admitted during his deposition that they were only drafts, and (2) Sterling's claims

that the written terms of the Exhibit C agreements contained terms and obligations that were plainly not contained in those agreements.

The business court's order denying GRP's motion for sanctions specifically addressed Sterling's reliance on the Exhibit C agreements, noting that one of the agreements was partially executed by GRP Franklin and Sterling believed that similar agreements had been executed by the other GRP entities in order to obtain financing for the GRP facilities, which arguably had some support in emails exchanged in connection with the partially-executed agreement. The court also noted that it found the issue of whether Sterling had sufficiently pled the partial performance exception to the Statue of Frauds to be a "closer question." Because there is at least some evidence to support the business court's ruling, we must affirm. See *Chadwick v. Brazell*, 331 Ga. App. 373, 382 (5) (771 SE2d 75) (2015).

*Judgments affirmed. Mercier, C. J., and McFadden, P. J., concur.*